ESTATE OF JOYCE C. HALL, DECEASED, DONALD J. HALL, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 39319-86.        Filed February 14, 1989.

*Robert J. Sisk, Stuart J. Hendel, Norman C. Kleinberg, David R. Tillinghast, George R. Haydon, Charles Egan, Dwight C. Arn, Karin Greenfield-Sanders,* and *Russell W. Baker,* for the petitioner.

*Kendall C. Jones, Lewis R. Carluzzo,* and *Nancy B. Romano,* for the respondent.

COHEN, *Judge:* Respondent determined a deficiency of $201,776,276.84 in the Federal estate tax of the estate of Joyce C. Hall, deceased, Donald J. Hall, executor. After concessions, the issue for decision is the value for estate tax purposes of decedent's equity interest in Hallmark Cards, Inc.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the facts set forth in the stipulations are incorporated in our findings by this reference. Joyce C. Hall (decedent) died testate on October 29, 1982. At the time of his death, decedent resided in Leawood, Kansas. Decedent's will, which named his son Donald J. Hall as executor of the estate, was admitted to probate in the District Court of Johnson County, Kansas, on November 29, 1982. Under the provisions of his will, decedent left his entire residuary estate, after specific bequests of his residence and personal belongings to his children, to charity.

Decedent's executor timely filed a Federal estate tax return. All assets included in the gross estate were valued as of the date of death (the valuation date). The gross estate included 70,083,000 shares of class C common stock of Hallmark Cards, Inc. (Hallmark), and 1,797,000 certificates of participating interest representing voting trust certificates of Hallmark class B common stock.

Petitioner reported the class C common stock on decedent's Federal estate tax return at a value of $1.87835 per share, for a total of $131,640,403.05. Petitioner reported the certificates of participating interest on decedent's Federal estate tax return at a value of $1.98157 per share, for a total of $3,560,881.29.

In the notice of deficiency, respondent determined a deficiency of $201,776,276.84, primarily arising from (a) the determination that the value of the gross estate should be increased by $167,614,006.95 as to the class C common stock; and (b) the determination that the value of the gross estate should be increased by $4,507,648.71 as to the certificates of participating interests.

### Overview of Hallmark

Originally founded in 1910 and incorporated in 1923, in 1982 Hallmark Cards, Inc. (Hallmark), was the leader in the United States in the design, manufacture, and sale of greeting cards and related products. Although Hallmark was privately held, if it had been a public corporation it would have ranked in size among the "Fortune 500" largest industrial companies in the United States.

Decedent was the founder of Hallmark and served as chairman of the board until his death. Decedent's son was the chief executive officer of Hallmark at the time of decedent's death. Hallmark's board of directors consisted of 12 members, 5 who were employees of Hallmark, 5 who were not employees, and 2 who were family members.

Hallmark grew rapidly in the early years of its business, and by 1927, sales exceeded $1 million. In the 1930's, Hallmark pioneered the use of freestanding display fixtures to sell its cards, an important retailing innovation. In the 1940's, Hallmark began to develop a national market through a nationwide advertising campaign centered on its now familiar slogan "when you care enough to send the very best." Hallmark also initiated in the 1940's its first product diversification strategy, selling gift wrap and party goods to complement its greeting card sales.

By the 1950's, Hallmark, established as the premium brand of greeting cards, had developed a network of card shops, the "class" distribution channels, which sold primarily cards and gift items. In 1959, Hallmark introduced the Ambassador brand of products in an effort to augment its sales to the "mass" distribution channels. The Ambassador brand was not as profitable as the Hallmark brand due to the more competitive marketing environment of the "mass" channels, and at the valuation date, Ambassador represented only 11 percent of Hallmark's business.

In the late 1950's, Hallmark founded its International Division. During the 1970's and early 1980's, Hallmark continued to expand its International Division, and at the valuation date had operations in Canada, Ireland, Germany, New Zealand, England, Scotland, France, and Australia. To expand its product lines and to reduce its reliance on a single source of revenue, Hallmark acquired Trifari, Krussman & Fishel, a manufacturer of costume jewelry; Charles D. Burnes Co., a manufacturer of picture frames; and Litho-Krome Co., a lithographic printing shop. Hallmark also had a retail division, which operated three high quality department stores in Kansas City, Missouri. Hallmark's subsidiaries and its retail division were all losing money in the years prior to the valuation date.

During the 1960's, Hallmark embarked on a major real estate development project in Kansas City, Missouri. Hallmark organized a subsidiary, Crown Center Redevelopment Corp. (Crown Center), to undertake this project. Crown Center was unprofitable, and was subsidized by Hallmark throughout its existence to the time of trial in May 1988. On July 17, 1981, two suspended concrete and steel walkways (skywalks) spanning the lobby of the Kansas City Hyatt Regency Hotel, Crown Center, collapsed, killing 114 people and seriously injuring 238 more. At the valuation date, Hallmark and Crown Center were embroiled in major litigation arising out of that disaster.

### Hallmark Capital Stock

At the valuation date, Hallmark had three classes of stock outstanding—class A preferred stock, class B common stock, and class C common stock. The class A preferred stock was created in a 1977 recapitalization of Hallmark and was held by the Hallmark Employee Profit-Sharing and Ownership Plan (the plan) and by Hallmark employees participating in the plan. The class A preferred stock was a class of nonvoting common stock with dividend and liquidation preferences. Decedent did not own any class A preferred stock.

The class B common stock was the sole voting class of common stock. Each share had the right to cast one vote for the election of directors and for any other matter subject to a vote of shareholders. The class B common stock had a right to receive dividends and liquidating distributions, subject to the preferences for class A preferred stock.

In 1963, certificates representing all of the shares of class B common stock were deposited with the First National Bank of Lawrence, Kansas, as trustee under a trust indenture dated December 17, 1963 (the 1963 indenture). Beneficial owners of class B common stock held certificates of participating interest issued by the trustee, and they retained all of the economic incidents of ownership of the underlying shares, including the right to receive all dividends and the right to vote the shares.

The 1963 indenture will remain in effect until 20 years after the death of the last survivor of the descendants of decedent who were living on December 17, 1963. It is estimated that this event will occur sometime after the middle of the next century. The 1963 indenture served to enforce transfer restrictions on the class B common stock. By its terms, the 1963 indenture may be terminated or amended only upon the vote of the holders of certificates representing 95 percent of the outstanding class B common shares. At no time did decedent hold certificates representing 95 percent of the outstanding class B common shares of Hallmark.

The class C common stock, created in a 1980 recapitalization of Hallmark, was nonvoting common stock, except to the extent that Missouri law or Hallmark's January 2, 1980, restated articles of incorporation (the restated articles) expressly conferred voting rights upon it. Subject to the preferences of the class A preferred stock, the class C common stock participated on a share-for-share basis with class A preferred and class B common in any dividend or liquidating distribution made by Hallmark.

At the valuation date, decedent owned less than 25 percent of the total outstanding shares of both class B and class C common stock. The remaining outstanding shares of class B and class C common stock not held by decedent at the valuation date were held by or for his descendants. All class A preferred stock was held by the plan.

### Policy to Keep Hallmark Private

Hallmark maintained a policy against public disclosure of financial information. As of the valuation date, it had always been and continued to be Hallmark's policy to remain a privately held company.

Decedent's objective in ensuring that Hallmark remained a private company was to retain the ability to make long-range decisions without worrying about short-term earnings and stock prices. As a private corporation, Hallmark had a greater ability to maintain the confidentiality of its operating information as well as to save the cost and management time public companies must spend for regulatory and compliance requirements. Decedent's policy

ofkeeping Hallmark a private corporation was shared by members of the Hall family and by the board of directors of Hallmark.

Decedent believed that three groups should share the ownership of Hallmark: the Hall family, Hallmark employees, and charities. Between 1930 and 1960, decedent and his wife transferred large blocks of Hallmark stock to long-term irrevocable trusts for their family. Gift tax was paid with respect to each transfer that was subject to tax.

Hallmark had a policy to inspire employee productivity and interest in the corporation's results by offering employees the opportunity to participate in Hallmark's success. In furtherance of this policy to provide incentives to a broad spectrum of employees, Hallmark established a profit-sharing plan in 1956.

Both decedent and his wife made substantial contributions to charities in the Kansas City area during their lifetimes. Both left the residue of their estates to charity, expressing a preference for the Hallmark Educational Foundation of Kansas (the foundation).

The policy of keeping Hallmark a private corporation was successful. At the valuation date, no Hallmark security had ever been listed on any public exchange or traded in any public market. Similarly, at the valuation date, no Hallmark security had ever been held except by private charitable foundations, by or for the Hall family, and by or for current or former employees.

### Voting Trust Agreement

All of decedent's class B common stock was held by a voting trust created under a voting trust agreement (voting trust) dated December 4, 1968. The voting trust held 54.6 percent of Hallmark's total outstanding shares of class B common stock. Decedent owned 43.3 percent of the class B shares subject to the voting trust.

Pursuant to a 1981 amendment, the voting trust provided for five voting trustees. Of these five trustees, one was designated as the Hallmark trustee and was elected by the other trustees from among Hallmark's outside directors for a 1-year term. The remaining four trustees were elected for staggered 4-year terms by vote of the other trustees. At the

valuation date, the voting trustees were decedent, his son, his two daughters, and Irvine O. Hockaday, Jr., the Hallmark trustee.

The voting trust, as amended, provided that by action of any three trustees, the trustees had the exclusive right to vote the shares of class B common stock deposited in the voting trust with respect to the election of Hallmark's directors and to vote on all other matters on which a vote of class B common shares was required or permitted. A vote of 79 percent of the voting trust certificate holders, however, was required before the voting trustees could vote to liquidate or merge Hallmark or sell all the shares in the voting trust. Under its terms, the voting trust will remain in effect until after the middle of the next century. The voting trust could be dissolved only upon the vote of the holders of 79 percent of the voting trust certificates and a majority of the trustees of the voting trust.

### Stock Transfer Restrictions

All classes of Hallmark stock were subject to share transfer restrictions; however, there were more transfer restrictions on the class B common stock than there were on the other classes of shares. All shares of class B common stock not subject to the voting trust, as well as all voting trust certificates (including the certificates held by decedent), were subject to the restrictions set forth in the 1963 indenture.

The 1963 indenture, as amended, provided that the class B common stock could not be transferred to any person other than a "permitted transferee" (as defined in the 1963 indenture) without first being offered for purchase, initially to Hallmark and thereafter to the other class B shareholders. "Permitted transferees" included Hallmark, members of the Hall family or their estates, and trusts for their benefit.

In addition, the 1963 indenture provided that class B common shares could be purchased at a price equal to the then prevailing adjusted book value, and permitted the purchaser to elect to pay only 10 percent of the purchase price in cash with the balance to be paid in nine equal annual installments with interest of 5 percent. If the first refusal rights were not exercised and a class B share

interest passed to an "outside" holder, that interest remained subject to the same rights of first refusal upon any subsequent proposed transfer. The "outside" shares were also subject to a continuing call under which Hallmark's board of directors could require the holder to sell the shares to Hallmark or other holders of first refusal rights on the terms set forth above.

The restated articles provided that no class C common shares could be transferred, other than to a "permitted transferee," without first being offered to Hallmark and to the other class C shareholders in accordance with procedures set forth in the restated articles.

### 1974 Buy-Sell Agreement

Decedent, Hallmark, and U.S. Trust Co. of New York (U.S. Trust), as trustee of the Hallmark Employee Profit-Sharing and Ownership Plan (the plan), entered into an agreement dated November 4, 1974. Decedent agreed that on his death his executor would sell to U.S. Trust, and U.S. Trust agreed that it would buy, approximately two-thirds of decedent's Hallmark stock at the current adjusted book value.

In connection with a 1977 recapitalization of Hallmark, the plan exchanged all of its shares of class B voting common stock for shares of nonvoting class A preferred stock having the same aggregate adjusted book value. In 1978, the buy-sell agreement was amended to release decedent from his obligation to sell class B voting common stock and to substitute an obligation to sell class A preferred stock.

Following a 1980 recapitalization, the buy-sell agreement was changed to permit decedent's executor to deliver to Hallmark shares of class C stock having the same aggregate adjusted book value as (a) 1,250,000 shares of class B stock and (b) 48,750,000 shares of class C stock. Hallmark was obligated to issue to the estate shares of class A preferred stock having the same aggregate adjusted book value.

At decedent's death, his estate plan was carried out as he intended. Decedent's executor exchanged 50,068,691 shares of class C common stock for 47,460,612 shares of class A

preferred stock. The class A shares were sold to the plan for the sum of $94,046,525, the adjusted book value of those shares as of December 31, 1981.

### 1981 Option Agreement

Decedent and Hallmark entered into an option agreement granting Hallmark an option to buy decedent's shares of class C common stock not subject to the 1974 buy-sell agreement at a fixed price equal to the December 31, 1981, adjusted book value of the shares as computed by Hallmark. At decedent's death, Hallmark's outside directors voted to exercise the option, and acquired the remainder of decedent's class C common stock for the cash price of $37,593,877.31, the adjusted book value of those shares as of December 31, 1981.

### Adjusted Book Value

Hallmark maintained its financial records on a calendar year basis. Hallmark used adjusted book value to establish the price of its stock for the purposes of the transfer restrictions as well as to value participation in and termination of individual employee accounts in the plan.

Adjusted book value was computed once per year at the end of each calendar year. The 1963 indenture and the restated articles provided that the computation of adjusted book value began with Hallmark's book value per share. A goodwill premium was added to book value if average return on equity for the previous 5 years exceeded 10 percent. Alternatively, a goodwill discount was deducted from book value if average return on equity fell below 10 percent. The goodwill premium or discount was computed by taking Hallmark's average earnings per share for the previous 5 years, subtracting 10 percent of the book value per share, and multiplying the result by 5.

In computing adjusted book value, an additional adjustment was made to account for differences in voting rights and liquidation and dividend preferences. A premium, 5 percent of the unadjusted class B book value per share, was added to class B common shares because this class of stock had voting power. Similarly, a 5-percent premium was

added to class A preferred shares because this class of stock had liquidation and dividend preferences. A discount, equal to the aggregate premium added to the class A preferred and class B common shares divided by the number of class C common shares, was subtracted from class C shares because this class of stock did not have voting rights or dividend or liquidation preferences.

At the valuation date, Hallmark computed the adjusted book value at $1.98157 per class B common share and $1.87835 per class C common share.

## The Greeting Card Industry

Although greeting card dollar sales nearly doubled from 1972 to 1981, this dollar growth was primarily the result of inflation and some substantial price increases. At the valuation date, Hallmark was part of a mature industry that was not growing in real terms.

Two factors at the time of the valuation date were considered immediate and material threats to the greeting card industry. In the year prior to the valuation date, there had been two price increases in the cost of a first-class postage stamp. In March 1981, the cost of a first-class stamp jumped 20 percent, from 15 cents to 18 cents. Just 7 months later, in November 1981, the postal service raised the price of a first-class stamp again, to 20 cents, an 11-percent increase. These increased postal rates, accompanied by less reliable mail delivery service, were painful to the greeting card industry.

The telephone had long been an alternative to the greeting card. At the time of the valuation date, long-distance telephone rates were expected to decrease due to the proposed breakup of AT&T and increased competition from such companies as MCI and Sprint. The lower cost of telephone service, like the increase in postal rates, worked to slow the growth of the greeting card market.

## Hallmark's Position in the Greeting Card Industry

At the valuation date, two firms were leaders in the greeting card industry, Hallmark and American Greetings Corp. (American Greetings). Together, the two firms held

approximately 68 percent of the greeting card market. Although Hallmark was the larger of the two firms, American Greetings was better positioned in the faster growing mass distribution market.

Although the class distribution channels still maintained a greater share of the market than the mass channels, from 1979 to 1981 the mass channels gained 11.4 percent of market share, whereas the class channels lost 3.5 percent of market share. The fastest growing distribution channel at the time of the valuation date was food stores. In this channel, American Greetings had a 51.2-percent share compared to Hallmark's 38.1-percent share. The channel in which Hallmark was dominant, the card and specialty shop channel, had become saturated by the valuation date and fewer of the larger regional malls where most card shops were located were expected to open. The negative growth in the card and specialty shop channel, coupled with a channel shift towards the more competitive convenience channels in which Hallmark was not the dominant force, diminished Hallmark's growth prospects.

### Financial Condition of Hallmark[1]

Despite Hallmark's diversification efforts, at the valuation date its earnings remained totally dependent on greeting cards. In 1981, Hallmark's sales of greeting cards alone accounted for approximately 50 percent of sales and 96 percent of profits. Although its future growth prospects were diminished, Hallmark experienced significant growth in market share and net sales during the 5-year period 1978 through 1982. During this period, Hallmark maintained a strong financial position, with minimal leverage and a large surplus of working capital.

At the valuation date, approximately 112 suits were pending against Hallmark and Crown Center resulting from the Hyatt Skywalk disaster. The individual plaintiffs in these actions were seeking in the aggregate more than $1

---

[1]By agreement of the parties and order of the Court, numerous portions of the record were sealed at petitioner's request. Because most of such confidential evidence consists of sensitive financial information relating to Hallmark, we have, to the extent possible, minimized specific findings concerning Hallmark's financial condition. We have, nevertheless, considered the entire record, and our general findings are consistent therewith.

billion in compensatory damages and approximately as much in punitive damages.

In addition, as of the valuation date it was expected that plaintiffs in a pending Federal court class action would seek an additional $500 million in punitive damages against Hallmark and Crown Center. All of these plaintiffs were claiming there could be multiple punitive damages awards under Missouri law, and there was no Missouri case on point to the contrary. It was unclear whether the insurance policies carried by Hallmark and Crown Center would provide coverage for punitive damages. Hallmark and its counsel believed that the outcome of these lawsuits would not have a material adverse effect on its consolidated financial position. Shortly prior to the valuation date, these beliefs were communicated to the public accounting firms employed by Hallmark to prepare its financial statements.

### Economic Conditions at the Valuation Date

At the valuation date, the American economy was experiencing a transition from a recession to a recovery. Interest rates had come down, the stock market was suddenly and sharply moving higher, and inflation was moderating. The Federal Funds rate had decreased from 15.3 percent to 9.4 percent in 1 year, and the American dollar was very strong. At the valuation date, the average price-to-earnings ratio for Standard and Poor's 500 Stocks was 9.9, and the ratio for the Dow Jones 30 Industrials was 9.4.

### Expert Valuations

Petitioner's expert witnesses, George B. Weiksner (Weiksner) and William A. Shutzer (Shutzer), and respondent's expert witness, Lynn McCrary (McCrary), valued the stock in issue. Because of fundamental differences in approach between respondent's and petitioner's experts, particularly with respect to the effect of the transfer restrictions on the Hallmark stock, the amounts arrived at in the valuations were extremely far apart. The experts all concluded that, as of the valuation date, there existed only one publicly traded greeting card company, American Greetings, that was comparable to Hallmark. Petitioner's experts,

therefore, selected additional comparable companies from other industries because they believed that comparing Hallmark with only one company would be potentially misleading. Respondent's expert, however, based his determination on only one comparable company, American Greetings.

From their estimates based on comparable companies, petitioner's experts deducted a percentage discount because shares in Hallmark were closely held rather than publicly traded, and were subject to voting restrictions. Respondent's expert, however, added a percentage "market premium" to his estimate of Hallmark share values vis-à-vis American Greetings share values. Respondent's expert then deducted a percentage discount to reflect decedent's minority share interest in Hallmark, but did not deduct any discount for voting restrictions.

The following chart lists the different values arrived at by petitioner's experts, Shutzer and Weiksner, and respondent's expert, McCrary:

|          | Class A   | Class B   | Class C   |
|----------|-----------|-----------|-----------|
| Weiksner | $1.98157  | $1.98157  | $1.87835  |
| Shutzer  | - - -     | 1.59707   | 1.59544   |
| McCrary  | 4.27000   | 4.49000   | 4.27000   |

### Weiksner

In 1982, petitioner retained the First Boston Corp. (First Boston), an investment banking firm, to value Hallmark class A preferred stock and class B and class C common stock as of the valuation date. Weiksner was a managing director of First Boston and participated in the appraisal of the Hallmark stock. In November 1982, First Boston determined that the class A preferred stock had a fair market value of $1.98157 per share, the class B common stock had a fair market value of $1.98157 per share, and the class C common stock had a fair market value of $1.87835 per share.

Petitioner reported on its estate tax return the 70,083,000 shares of class C common stock and the 1,797,000 class B voting trust certificates at the values for which First Boston appraised the shares in its report dated November 17, 1982. First Boston prepared an additional report dated

May 1988, in which it described in greater detail the valuation process that was used in 1982.

First Boston began its valuation by analyzing the greeting card industry and Hallmark's position therein. Next, First Boston examined Hallmark's financial statements for the 5 years immediately preceding the valuation date and computed various financial ratios. First Boston found that American Greetings, Hallmark's principal competitor, had accelerating growth in sales and net income, improving profit margins, and a shift to the mass marketing distribution channel. At the valuation date, however, this competitive activity had not had an adverse impact on Hallmark's leading position in the greeting card industry.

First Boston conducted a study to evaluate the accuracy of the Hallmark formula for computing adjusted book value of its stock by using the Hallmark formula to value the stock of comparable companies for a 10-year period ending with the valuation date. First Boston believed that a number of comparable companies must be analyzed, and that comparison to a single company was not sufficient, even if such company were the principal competitor of the company being valued.

Accordingly, First Boston selected six companies for comparison with Hallmark. In addition to American Greetings, First Boston chose A.T. Cross Co., a leading manufacturer of writing instruments; Avon Products, Inc., the world's largest manufacturer of cosmetics, fragrances, and fashion jewelry; the Coca-Cola Co., the largest maker of soft drinks; Lenox, Inc., the nation's leading producer of fine china; and Papercraft Corp., a manufacturer of gift wrap items and household products. First Boston believed that these companies provided useful comparisons because they produced brand name consumer goods, were leading companies in their industries, had publicly traded common stock, and had business and financial characteristics similar to Hallmark.

After selecting the comparable companies, First Boston calculated adjusted book values for each company according to the Hallmark formula for the years 1973 to 1982. First Boston then compiled the annual high and low common stock prices, adjusted for stock splits, for the comparable

companies over the same time period. Because Hallmark stock was privately held, First Boston discounted the stock prices of the comparable companies by 35 percent to estimate private company stock values for each comparable.

In general, the adjusted book value for each of the comparable companies was between the high and low stock prices for each year. The adjusted book value of American Greetings, Hallmark's most direct competitor, was greater than its high stock price in 6 of the 10 years prior to the valuation date. Based on the results of this study of the Hallmark adjusted book value formula, First Boston concluded that the Hallmark formula provided a reasonable estimate of the fair market value of Hallmark stock at the valuation date. First Boston, therefore, computed a final value of $1.98157 and $1.87835 per share for the class B and class C common stock, respectively.

### Shutzer

In February 1986, petitioner retained Shearson Lehman Hutton Inc. (Shearson Lehman), an investment banking firm, to value Hallmark stock at the valuation date. Shutzer was a managing director of Shearson Lehman and participated in the appraisal of the Hallmark stock. In May 1988, Shearson Lehman determined that the class B common stock had a fair market value of $1.59707 per share, and the class C common stock had a fair market value of $1.59544 per share. Shutzer communicated these values to petitioner prior to Shearson Lehman's receiving any notice of the values reported on decedent's estate tax return or the conclusions reached by Weiksner or McCrary. Shearson Lehman prepared a detailed report dated May 1988 supporting its opinion as to Hallmark stock values, and Shutzer was petitioner's principal expert witness at trial.

The valuation process used and the conclusions reached by Shearson Lehman were similar to those of First Boston. After performing a detailed analysis of Hallmark, the greeting card industry, and economic conditions as of the valuation date, Shearson Lehman compared Hallmark with American Greetings as well as 15 other comparable companies. Shearson Lehman believed that considering several comparable companies reduced the probability that individ-

ual characteristics, temporary market inefficiencies, or aberrations relating to one company might bias the valuation analysis.

Although American Greetings was Hallmark's most proximate publicly held competitor, Shearson Lehman believed that this broad group of comparable companies shared one or more of the following similarities with Hallmark:

(1) sold low-cost, consumer, nondurable goods through channels similar to those used by greeting card companies;

(2) had a stable, high-profile, quality reputation with the consumer and a leading brand name;

(3) sold products in which the images of both the product and the company and the product's function were differentiable from that of its competitors; and

(4) sold products that involved some element of social expression.

In addition to the companies selected on the basis of the criteria described above, Shearson Lehman also selected four other companies that were comparable to Hallmark in that they were leaders in their respective industries and possessed excellent financial records: McDonald's, Anheuser Busch, IBM, and Coca-Cola. Each of these additional comparable companies was highly regarded by the investment community for its quality management, leading market position, and excellent financial condition. Had Hallmark stock been publicly traded, Shearson Lehman believed it would have enjoyed a similar reputation.

Shearson Lehman believed that an investor might use one or more of the following valuation ratios in valuing closely held stock:

(1) price-to-earnings, the current market price per share divided by earnings per share;

(2) market-to-book, the current market price per share divided by common book value or net worth per share;

(3) dividend capitalization, the annual dividends per share divided by the current market price per share;

(4) adjusted operating return on total capitalization, income from operations plus interest income and depreciation divided by the current market value of total outstanding common shares plus long-term debt and other long-term liabilities; and

(5) market price to net revenues, current market price per share divided by net revenues per share.

Although current market price is an element of each of the above ratios, an investor can appraise a closely held stock by determining all elements of the ratio other than current market price and then estimating the aggregate ratio by comparisons with publicly traded companies whose ratios are readily available. Of these market valuation ratios, Shearson Lehman believed that the price-to-earnings multiple most directly and unambiguously reflected the financial market's assessment of the future earnings potential of a business. According to Shearson Lehman, the price-to-earnings ratio was the ratio it and other leading investment banking firms utilized for stock and business valuations, and was the ratio most often considered by investors.

Shearson Lehman believed that the other valuation ratios were not useful in valuing Hallmark stock. Shearson Lehman considered the market-to-book ratio to be an unreliable indicator of current value because historic asset cost often did not reflect future earnings potential. Shearson Lehman believed that dividend capitalization was a useful method for determining market value for companies in industries in which reinvestment opportunities are limited by economics or law. Because there were no such limitations on Hallmark's reinvestment opportunities, Shearson Lehman believed the dividend capitalization ratio was of little use in valuing Hallmark common stock. Similarly, Shearson Lehman believed that the adjusted operating return on total capitalization ratio was misleading for manufacturing businesses like Hallmark that must reinvest their cash-flow into operations. Shearson Lehman considered the market price to net revenues ratio to be useful where the subject company, unlike Hallmark, had extremely high growth expectations and little current income. This valuation method, however, fails to reflect a company's fundamental operating characteristics, and was considered misleading when comparing companies in different industries. Shearson Lehman, therefore, primarily relied on the price-to-earnings ratio in valuing Hallmark common stock through a comparable company analysis.

Shearson Lehman did not, however, rely exclusively upon historical earnings or earnings-based financial data in valu-

ing Hallmark stock. In estimating the price-to-earnings ratio for which Hallmark common stock would trade in a public market, Shearson Lehman carefully compared Hallmark with each of the comparable companies and considered all factors that Shearson Lehman believed might affect that ratio. In addition to earnings data, these factors included the U.S. economy, the greeting card industry, Hallmark's position in that industry, the competitive environment, and Hallmark's growth potential. Shearson Lehman also estimated the effects of the large potential liabilities arising from the legal claims associated with the Hyatt Skywalk disaster.

Shearson Lehman concluded that Hallmark stock would sell for a lower multiple of earnings than would American Greetings, even though Hallmark was the leading firm in its industry and American Greetings was a smaller competitor. Shearson Lehman found that other leading firms considered in their analysis also traded at a lower multiple than their smaller competitors. Shearson Lehman believed that investors were more concerned with future growth opportunities than with absolute size, which reflects past accomplishments. When future growth expectations for a small company are greater than those for a larger, stronger competitor, the smaller company will trade at a higher price-to-earnings multiple.

After estimating a preliminary price-to-earnings ratio of Hallmark stock based upon comparisons of Hallmark with each of the comparable companies, Shearson Lehman adjusted this preliminary price-to-earnings ratio by 20 percent to take into account the negative effects of the Hyatt Skywalk litigation on Hallmark's public market value. Shearson Lehman then undertook similar comparative analyses using the market-to-book and adjusted operating return on total capitalization ratios. The results of these alternative methods confirmed the reasonableness of the adjusted preliminary price-to-earnings ratio. Shearson Lehman also examined Hallmark's balance sheet and considered whether the value of Hallmark's assets might justify a higher valuation for Hallmark stock than an appraisal using the price-to-earnings method. Because Hallmark's assets consisted primarily of specialized manufacturing and office

equipment, Shearson Lehman concluded that the liquidation value of Hallmark's assets would not exceed the adjusted preliminary price-to-earnings valuation.

Shearson Lehman concluded that all classes of Hallmark common shares would trade in a public market for $3.16 per share, computed by multiplying the adjusted preliminary price-earnings ratio by Hallmark's 1982 earnings per share. Shearson Lehman then discounted the $3.16 figure by 36 percent to reflect the lack of liquidity and voting restrictions applicable to the Hallmark stock, yielding an unrestricted/illiquid value of $2.02 per share. Shearson Lehman, however, believed that the $2.02 value ignored the complex transfer restrictions that governed transfers of Hallmark stock at the valuation date. Without considering the specific restrictions on Hallmark stock, Shearson Lehman believed that the existence of any sale or transfer restrictions on any investment asset reduced the value of that asset to a potential buyer.

As described above, the price at which Hallmark securities could be purchased pursuant to the transfer restrictions was the adjusted book value of the shares. The transfer restrictions essentially provided Hallmark and the existing shareholders with rights of first refusal to purchase the securities at their adjusted book values each time the securities were offered for sale to a third party. Those exercising the rights of first refusal could elect to pay 10 percent of the purchase price in the year of the purchase, and pay the remainder over 9 years with notes bearing interest at 5 percent. Shearson Lehman did not believe that an investor would buy Hallmark shares and attempt through risky, costly, and time-consuming litigation to have these transfer restrictions removed. Shearson Lehman believed, therefore, that the effect of the transfer restrictions was to set a maximum value at which Hallmark securities would trade, regardless of the higher unrestricted/illiquid value calculated above.

In summary, Shearson Lehman concluded that, due to the trading restrictions governing the securities and the fact that the restrictions permitted payment with 10-percent cash and the remainder in 9-year below-market notes, at the

valuation date the restricted value of Hallmark class B and class C stock was approximately $1.60 per share.

### McCrary

McCrary was a senior vice president of Philadelphia Capital Advisors (PCA), a firm specializing in investment analysis and business valuation. Respondent engaged PCA in 1985 to value Hallmark stock as of the valuation date. The values for Hallmark class B voting trust certificates and class C common stock set forth in the notice of deficiency were based on a report submitted to respondent by PCA on January 9, 1986.

The PCA report provided both a business enterprise valuation and a minority share valuation for the shares in issue. PCA noted that the business enterprise valuation applied to the sale of an entire company as a going concern, while the minority share valuation applied to any number of shares less than 50 percent of the total outstanding shares.

PCA used two major techniques to develop both the business enterprise and the minority share valuations for Hallmark shares: the market comparison approach and the income capitalization approach. Like petitioner's experts, respondent's expert also compared Hallmark to a similar company. PCA noted in its valuation report that:

> A prudent investor essentially views anticipated dividends and market appreciation as a potential return on his investment commensurate with the risks and hazards involved and in consonance with a wide range of alternate, identically-risky investment opportunities.

In performing its comparative analysis, however, PCA selected only one comparable company, American Greetings. In selecting the appropriate market comparison ratios, PCA gave consideration to four major factors: (1) Reasonably similar companies; (2) respective industry grouping; (3) economic climate; and (4) stock market environment. After reviewing representative publicly traded industry groupings and firms, PCA concluded that American Greetings was the only reasonably comparable company to Hallmark because it had a similar product mix and capital structure and served the same markets.

PCA noted that, at the valuation date, Hallmark was larger and more profitable than American Greetings. PCA,

therefore, presumed a "functional relationship" between price-to-earnings ratios and earnings growth. PCA, however, provided no theoretical or empirical research to support the use of this "functional relationship" to value equity securities.

Based on this "functional relationship" between price-to-earnings ratios and earnings growth, PCA concluded that, if it were publicly traded, Hallmark stock would command a "market premium" over American Greetings of not less than 118 percent. In deriving a price-to-earnings ratio for Hallmark, however, PCA compared Hallmark's earnings for the 5-year period ended December 31, 1982, with American Greetings' earnings for the 5-year period ended February 28, 1982.

PCA applied this 118 percent "market premium" to American Greetings' market ratios to arrive at the market ratios applicable to Hallmark. PCA then applied an additional 48-percent control premium and concluded that the market comparison approach indicated a business enterprise value of $8.05 per share, if Hallmark stock had been publicly traded at the valuation date.

PCA also used the income capitalization approach, a technique whereby fair market value is determined based on the value of the cash flow that an asset can be expected to generate over its useful life. In calculating Hallmark's projected cash-flow, PCA began its analysis with Hallmark's reported net income and added back the noncash charges for depreciation. PCA, however, did not add back to reported net income any noncash charges for deferred taxes and did not subtract from reported net income any estimated cash needs for future capital expenditures and increases in working capital.

After calculating Hallmark's projected cash-flow, PCA discounted this cash-flow using a "weighted average cost of capital" which combined both an equity discount rate as well as a debt discount rate. PCA thus determined that the business enterprise value of Hallmark stock under the income capitalization approach was $6.49 per share.

PCA then calculated a weighted average business enterprise value by weighting the two previously computed values as follows: 65 percent to the value calculated under

the market comparison approach and 35 percent to the value calculated under the income capitalization approach. PCA thus determined that the weighted average business enterprise value of Hallmark stock was $7.50 per share, exclusive of Crown Center. PCA calculated the net book value of Crown Center as of December 31, 1982, at $0.12 per share. PCA then added these two figures to determine the total business enterprise value of Hallmark stock at the valuation date as $7.62 per share.

PCA also used the market comparison and income capitalization techniques to calculate a minority share valuation for Hallmark shares. As it had done in calculating the business enterprise valuation under the market comparison approach, PCA applied the previously determined "functional relationship" between price-to-earnings ratios and earnings growth to determine that Hallmark stock would command a "market premium" of not less than 118 percent over American Greetings stock. PCA thus concluded that the minority share value of Hallmark stock under the market comparison approach was $5.11.

Similarly, as it had done in calculating the business enterprise valuation under the income capitalization approach, PCA calculated Hallmark's discounted cash-flow using the projected cash-flow and the weighted cost of capital discussed above. PCA then discounted this figure by 32 percent to arrive at a minority share value of Hallmark stock under the income capitalization approach of $4.04.

PCA then calculated a weighted average minority share valuation by weighting the market comparison value by 65 percent and the income capitalization value by 35 percent. PCA thus determined that the weighted average minority share value of Hallmark stock was $4.49. To reflect the lack of voting rights for Hallmark class A preferred stock and class C common stock, PCA discounted the $4.49 per share value by 5 percent.

PCA's appraisal gave no consideration to the transfer restrictions in the restated articles of incorporation, nor to the voting trust agreement. PCA did, however, apply a 5-percent discount to reflect the lack of marketability associated with shares of a closely held company. PCA calculated this discount by estimating the flotation costs of

an initial public offering by which Hallmark could "go public." After applying this discount for lack of marketability, PCA concluded that the minority share value of Hallmark class A and class C stock was $4.27, and the minority share value of the class B stock was $4.49 at the valuation date.

ULTIMATE FINDINGS OF FACT

The fair market values of the voting trust certificates of Hallmark class B common stock and of the Hallmark class C common shares includable in decedent's gross estate equaled the adjusted book values per share on the valuation date.

OPINION

Petitioner contends that, as a matter of law, the 1974 buy-sell agreement and the 1981 option agreement fixed the value of decedent's class C stock for Federal estate tax purposes and that, in any event, the value of all of decedent's stock was the price set in the first refusal restrictions. Petitioner relies on cases such as *Brodrick v. Gore*, 224 F.2d 892, 896 (10th Cir. 1955); *Lomb v. Sugden*, 82 F.2d 166, 167-168 (2d Cir. 1936); *Wilson v. Bowers*, 57 F.2d 682, 683-684 (2d Cir. 1932); *Estate of Bischoff v. Commissioner*, 69 T.C. 32, 39-42 (1977); *Fiorito v. Commissioner*, 33 T.C. 440, 444 (1959); *Estate of Littick v. Commissioner*, 31 T.C. 181, 185-188 (1958); *Estate of Weil v. Commissioner*, 22 T.C. 1267, 1273-1274 (1954).

Respondent attempts to distinguish the cases relied on by petitioner, arguing that the agreements purporting to fix the price of the stock should be disregarded because they were merely estate planning devices and serve no bona fide business purpose. Sec. 20.2031-2(h), Estate Tax Regs. As indicated above, respondent's expert did not consider the effect of the agreements or the transfer restrictions on the value of the stock. McCrary testified during trial that he was instructed by respondent's agents to ignore the transfer restrictions.

There is no justification, in our view, for totally ignoring the transfer restrictions in this case and the prices set in

the buy-sell and option agreements. Despite respondent's suspicion and speculation about decedent's estate planning and testamentary objectives, there is no persuasive evidence to support a finding that the restrictions, or the offers to sell set forth in the agreements, were not susceptible of enforcement or would not be enforced by persons entitled to purchase under them.

Respondent argues that the buy-sell agreement, for example, merely "incidentally coincided with" the policy of keeping Hallmark private. This assertion is no more convincing than one that the agreements and transfer restrictions merely "incidentally coincided with" decedent's testamentary objectives. Agreements and restrictions not invalid on their face cannot be disregarded on such tenuous evidence of coincidence.

We need not here conclude, however, that the agreements indelibly fixed the value of the stock for estate tax purposes. We can avoid drawing inferences concerning the relative importance of decedent's motivations in entering into or instigating various agreements over the decades prior to his death, and can concentrate on the more objective evidence of fair market value. After weighing the respective opinions of the parties' experts, we cannot conclude that the fair market value is more than the adjusted book value of the stock.

Property includable in a decedent's gross estate is generally included at its fair market value on the date of the decedent's death. Sec. 2031(a);[2] sec. 20.2031-1(b), Estate Tax Regs. Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. *United States v. Cartwright,* 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs. The trier of fact must weigh all relevant evidence and draw appropriate inferences. *Hamm v. Commissioner,* 325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court; *Estate of Andrews v. Commissioner,* 79 T.C. 938 (1982).

---

[2] All section references are to the Internal Revenue Code as amended and in effect as of the date of decedent's death.

In determining the value of unlisted stocks, actual arm's-length sales of such stock in the normal course of business within a reasonable time before or after the valuation date are the best criteria of market value. *Estate of Andrews v. Commissioner,* 79 T.C. at 940. Neither petitioner nor respondent argues, however, that the sales between petitioner and the plan or between petitioner and members of the Hall family after the valuation date are factors to be considered in establishing the value of decedent's stock at the valuation date.

In the absence of arm's-length sales, the value of closely held stock should be based upon, in addition to all other factors, the value of listed stock of corporations engaged in the same or a similar line of business. Sec. 2031(b). The value of closely held stock must also be determined indirectly by weighing the corporation's net worth, prospective earning power, dividend-paying capacity, and "other relevant factors." *Estate of Andrews v. Commissioner,* 79 T.C. at 940; sec. 20.2031-2(f), Estate Tax Regs. These other relevant factors include the goodwill of the business, the economic outlook in the particular industry, the company's position in the industry and its management, and the degree of control represented by the block of stock to be valued. Sec. 20.2031-2(f), Estate Tax Regs., provides:

(f) *Where selling prices or bid and asked prices are unavailable.* If the provisions of paragraphs (b), (c), and (d) of this section are inapplicable because actual sale prices and bona fide bid and asked prices are lacking, then the fair market value is to be determined by taking the following factors into consideration:

(1) In the case of corporate or other bonds, the soundness of the security, the interest yield, the date of maturity, and other relevant factors; and

(2) In the case of shares of stock, the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors.

Respondent contends that Hallmark's adjusted book value was not the fair market value of decedent's stock because under the transfer restrictions, sales could have been made at a higher price to "permitted transferees." This contention fails for several reasons. Under the hypothetical willing buyer/willing seller standard, decedent's

stock cannot be valued by assuming that sales would be made to any particular person. In particular, we may not assume that the purchaser is a member of decedent's family. *Propstra v. United States*, 680 F.2d 1248, 1251-1252 (9th Cir. 1982); *Estate of Bright v. United States*, 658 F.2d 999, 1001 (5th Cir. 1981); *Minahan v. Commissioner*, 88 T.C. 492, 499 (1987); *Estate of Andrews v. Commissioner*, 79 T.C. 938, 954-56 (1982). Moreover, the court must not "permit the positing of transactions which are unlikely and plainly contrary to the economic interest of a hypothetical buyer." *Estate of Curry v. United States*, 706 F.2d 1424, 1429 (7th Cir. 1983). There is nothing in the record to suggest that there was even a remote possibility that any investor, including a permitted transferee, would purchase Hallmark shares at a price higher than adjusted book value. Despite the existence of permitted transferees for over 50 years, there has never been a purchase or transfer of Hallmark stock at more than its adjusted book value.

Respondent also contends that the transfer restrictions on Hallmark stock should be ignored because of decedent's success over the years in changing the categories of permitted transferees. Decedent, as a minority shareholder, could not unilaterally amend or terminate the transfer restrictions. The changes over the years within the three basic categories of permitted transferees—the Hall family, Hallmark employees, and charity—do not give rise to the inference that the transfer restrictions would be terminated or changed to permit transfers outside that limited group. Instead, the parties have stipulated that there has never been a proposal to sell stock to an outsider, and the transfer restrictions have never been changed to permit transfers other than transfers to or for the benefit of the Hall family. All of the evidence supports the conclusion that Hallmark's owners intended to maintain the privately held status of the corporation.

Petitioner, on the other hand, now contends that the fair market value of the stock was less than the adjusted book value, relying on Shearson Lehman's valuation. The stock was reported on decedent's estate tax return at adjusted book value, and the reported values are an admission by petitioner, so that lower values cannot be substituted

without cogent proof that the reported values were erroneous.

Each of the experts, appropriately, was purporting to determine the price at which the stock would have traded publicly if it were publicly held. Those methods are necessarily imprecise and involve estimates, and estimates and approximations are generally less reliable than evidence of actual sales of the property to be valued. See *Tripp v. Commissioner*, 337 F.2d 432, 434-435 (7th Cir. 1964), affg. a Memorandum Opinion of this Court.

The differences among the expert valuations in this case demonstrate the caution that is necessary in weighing expert valuations that zealously attempt "to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise" (*Messing v. Commissioner*, 48 T.C. 502, 512 (1967)), while ignoring relevant facts concerning the property to be valued. It is, of course, the responsibility of the parties to make known to the experts all the relevant facts that might affect the valuation and to instruct the experts to consider those facts. If the parties fail to provide the experts with complete information concerning material facts or reasonable assumptions to be made, they undermine the reliability of their experts and their opinions. In any case, we are not bound by the opinion of any expert witness. We may accept an expert's opinion or we may reject testimony that is contrary to our own judgment, especially where the witness' opinion of value is so exaggerated that the testimony is incredible. *Chiu v. Commissioner*, 84 T.C. 722, 734-735 (1985).

In this case, there is no question that the expert witnesses were qualified to state the opinions expressed by them. Respondent's expert, McCrary, however, was particularly hampered by respondent's instruction that he ignore any effect on value of the transfer restrictions and the agreements.

Although McCrary testified only as to the unrestricted value of the stock, he admitted that restrictions on the transferability of stock were factors to be considered "from a buyer's point of view," and that transfer restrictions would have an effect on value. Because the hypothetical buyer assumed in the definition of fair market value, i.e.,

one "having reasonable knowledge of relevant facts," would give some consideration to the effect of the restrictions, McCrary's opinion of unrestricted value of the stock is not reasonable or reliable evidence of fair market value.

Moreover, it is inconceivable to us that a potential buyer of Hallmark stock would consider only one alternative "comparable," i.e., American Greetings stock. The parties agree that American Greetings is the publicly traded company whose products are most comparable to Hallmark's, and all three experts treated it as such. Having made the comparison between Hallmark and American Greetings, however, petitioner's experts concluded that an investor would have taken other factors into account. In valuing shares of a closely held corporation, the value of publicly traded comparable companies is but one factor of many to be taken into account. Sec. 2031(b); sec. 20.2031-2(f), Estate Tax Regs.

Respondent argues that it is "simply wrong as a matter of law" to look beyond the single, publicly held company engaged in the sale of greeting cards to other companies engaged in the sale of other types of consumer nondurable goods or having similar financial characteristics. Respondent's argument too narrowly construes the concept of comparability and ignores the use of "similar" as well as "same" in section 2031(b). Respondent relies on *Northern Trust Co., Transferee v. Commissioner*, 87 T.C. 349, 376 (1986), affd. sub nom. *Citizens Bank & Trust Co. v. Commissioner*, 839 F.2d 1249 (7th Cir. 1988). That case, however, rejected expert opinions based on companies that were found to be noncomparable and concluded that "the market comparable approach is not available in this case." 87 T.C. at 377. That opinion does not justify using a market comparable approach based on a single competitor.

Respondent and McCrary describe the PCA valuation as based on a "funnel" approach. Even that terminology suggests inconsistency with the definition of fair market value. Finally, either accepting or rejecting the market comparable approach in this case would require rejection of respondent's expert report to the extent that it relies solely on comparisons to American Greetings.

The PCA valuation report stated that the market comparison approach "utilizes financial and market data on publicly-traded securities of companies engaged in same or similar business pursuits to the subject company." PCA's application of the market comparison approach, however, did not apply this (correct) description. Any one company may have unique individual characteristics that may distort the comparison. Similarly, the good fortune of one company in an industry may be at the expense of its direct competitors; American Greetings' dominance in the rapidly growing mass distribution channels posed a threat to Hallmark, whose strength was in the mature class distribution channels. PCA's market comparison analysis is thus defective in that it relied on only one comparable company with sales in a different market channel.

In addition to the flaws in PCA's overall approach to its valuation, there are serious problems with its application of specific valuation methods. We note below the more egregious of those problems.

Under its market comparison approach, PCA posited a "functional relationship" between price-to-earnings ratios and earnings growth in order to arrive at a "market premium" of 118 percent for Hallmark over American Greetings. PCA provided no academic research or empirical evidence to support the use of this "functional relationship" to value equity securities, and McCrary admitted on cross-examination that when PCA's "functional relationship" was applied to sample pairs of companies, one leading company and one smaller aggressive competitor, the "functional" price-to-earnings ratios bore no relationship to the actual price-to-earnings ratios for those companies.

In deriving a price-to-earnings ratio for Hallmark, PCA considered American Greetings' earnings for the 5-year period ended February 28, 1982, approximately 8 months before the valuation date and 10 months before the period ended December 31, 1982, which was used for Hallmark's earnings. McCrary testified that if he had used American Greetings' earnings for the 5-year period ended February 28, 1983, a period more comparable to the 5-calendar-year period 1978 through 1982 used for Hallmark, his "functional relationship" would have produced substantial dis-

counts for Hallmark's price-to-earnings ratio when compared to American Greetings'.

In addition to the flaws in its market comparison valuation, PCA's income capitalization valuation had numerous defects. In its application of the discounted future cash-flow valuation, PCA incorrectly defined cash-flow as net income plus depreciation, omitting consideration of deferred taxes, capital expenditures, and increases in working capital. PCA also used a weighted average cost of capital that combined both debt and equity discount rates, rather than using the pure equity discount rate to capitalize the expected returns for an equity investor.

Finally, the PCA valuation applied a 5-percent discount for lack of marketability, based on the expected costs of an initial public offering of Hallmark common stock. As a minority shareholder, a purchaser of decedent's shares could not have forced Hallmark to "go public." Hallmark intended to remain closely held by the Hall family, and none of the common shareholders intended to sell any shares to outsiders, as of the valuation date. PCA's 5-percent discount is too low, and the greater discounts employed by petitioner's experts are within the range used in the vast majority of decided cases. See, e.g., *Estate of Gilford v. Commissioner*, 88 T.C. 38, 61 (1987); *Estate of Oman v. Commissioner*, T.C. Memo. 1987-71; *Estate of Gallo v. Commissioner*, T.C. Memo. 1985-363; *Carr v. Commissioner*, T.C. Memo. 1985-19.

Overall, we can only conclude that PCA was instructed to prepare and did prepare an analysis that led to an artificial and excessive value for the Hallmark stock. In contrast to PCA, petitioner's experts acted reasonably in selecting comparable companies in the similar businesses of consumer nondurable goods, in drawing conclusions based upon careful comparisons of Hallmark with individual comparables, and in relying primarily upon the price-to-earnings method of valuation to test the reasonableness of Hallmark's adjusted book value formula.

In one respect, petitioner failed to provide its expert Shearson Lehman with pertinent information that affects our view of the value of decedent's stock. Shearson Lehman adjusted a preliminary computation by 20 percent to take

into account the negative effects of the Hyatt Skywalk litigation on Hallmark stock. Shutzer was not advised, however, that Hallmark and its counsel believed that the outcome of the lawsuits would not have a material adverse effect on its consolidated financial position—an opinion that presumably would have been conveyed by sellers to prospective buyers of Hallmark stock.

We are also not persuaded that an additional discount should be applied to reflect that the transfer restrictions on the stock permitted payment with 10-percent cash and remainder in notes bearing below market interest rates. Petitioner has not cited any precedent for applying this additional discount and has not persuaded us that such an approach is appropriate under these circumstances. Sales in the record were made for cash without resort to the favorable financing option.

We have no reason, however, to reject the opinion of First Boston. That opinion coincided with the admission on the estate tax return and with the price determined under the agreements. We are persuaded that it is the most reliable evidence of fair market value, and we adopt it.

In order to give effect to the stipulations of the parties,

*Decision will be entered under Rule 155.*