ESTATE OF MARGARET A. JANN, DECEASED, DOROTHY C. HALL, PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Jann v. Comm'r
Docket No. 3199-89 United States Tax Court
T.C. Memo 1990-333; 1990 Tax Ct. Memo LEXIS 351; 60 T.C.M. (CCH) 23; T.C.M. (RIA) 90333; July 2, 1990, Filed *351 Decision will be entered for the respondent. Douglas Lenicheck, for the petitioner. Mark J. Miller, for the respondent. COHEN, Judge. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency of $ 82,992 in the Federal estate tax of the estate of Margaret A. Jann. After concessions, the issue for decision is the value for estate tax purposes of 334.84 shares of the common stock of American Coil Spring Company. All section *352 references are to the Internal Revenue Code as amended and in effect as of the date of decedent's death, and all references to Rules are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulations are incorporated in our findings by this reference. Margaret A. Jann (decedent) died testate on April 4, 1985. At the time the petition was filed, Dorothy C. Hall, personal representative of the estate of decedent, resided in Wisconsin. At the time of her death, decedent owned 334.84 shares of common stock and 515.68 shares of preferred stock of American Coil Spring Company (the corporation) of Muskegon, Michigan. The corporation was a manufacturer of precision mechanical springs used principally as original equipment auto parts by the automobile industry and also used by the appliance industry. The stock of the corporation was closely held, and the shares were not listed on any exchange. The corporation had approximately 600 competitors in the United States, the largest of which was Associated Spring, a subsidiary of The Barnes Group, Inc. Prior to December 21, 1978, the corporation had *353 3,076 shares of common stock outstanding. On or about that date, certain shareholders entered into a redemption agreement with the corporation. Under the redemption agreement, the corporation agreed to redeem 1,445.48 shares at a price of $ 1,250 per share, payable over 10 years. Pending payment of the purchase price, the shares were to be held in escrow. On April 4, 1985, the corporation had 1,630.52 shares of common stock and 3,233.8 shares of 5 percent cumulative preferred stock outstanding. The 334.84 shares of common stock held by decedent represented approximately 20 percent of the corporation's outstanding common stock and made decedent the single largest individual shareholder of the corporation. Other shareholders of the corporation included Robert Voyt (Voyt), the president; Carl Johnson (Johnson), the executive vice president; and Steven Johnson, the treasurer of the corporation. On September 9, 1981, the corporation, Voyt and members of his family owning common stock of the corporation, and Johnson and members of his family owning common stock of the corporation entered into a mutual buy-sell agreement regarding the shares of stock. The buy-sell agreement provided *354 that the value of the corporation was to be determined annually and was to be used to determine the purchase price of the stock subject to the buy-sell agreement. Decedent was not a party to the buy-sell agreement, and her shares were not subject to any restrictions on alienation. On March 27, 1985, one week before decedent's death, Johnson and Voyt made a determination of the purchase price of the shares of the corporation for purposes of their buy-sell agreement. Under the terms of the buy-sell agreement, Johnson and Voyt determined that, if a share of stock were purchased due to the disability or termination of employment of either of them or because of a voluntary sale by a shareholder, the price would be set at $ 1,546 per share; if a sale took place due to the death of Johnson or Voyt, the price would be $ 1,755. As of the valuation date, the corporation was financially sound. Approximately 60 percent of its long-term debt had resulted from purchase of 47 percent of its outstanding common stock pursuant to the 1978 redemption agreement. The ratio of current assets to current liabilities was 2.68, and the ratio of current assets to total liabilities was 1.27. Common stock *355 equity was $ 3,765,636. Sales by the corporation during the prior 7 years ranged from a low of $ 12,870,000 in 1982 to a high of $ 18,045,000 in 1984. Net income during this period was very volatile, reflecting a cyclical business. Thus the corporation sustained losses of $ 366,000 in 1980, $ 3,000 in 1981, and $ 88,000 in 1982. It received profits of $ 390,000 in 1983 and $ 816,000 in 1984. The book value per common share outstanding as of December 31, 1984, was $ 2,070.90 per share, and the earnings per share for 1984 were $ 490.50. The average cash flow (net earnings plus depreciation) over the 5 years prior to decedent's death was $ 291.90 per share. As of the valuation date, the economic outlook for the automobile industry was positive although the business of the corporation was not expected to be as profitable as 1983 and 1984. In 1984, the domestic automobile industry had a record profit. In 1985, the corporation employed Manufacturers' Appraisal Company of Philadelphia to prepare an independent appraisal of the value of the corporation and its shares as of December 31, 1984. In its appraisal dated July 11, 1985, Manufacturers' Appraisal Company determined that *356 the total value of the common stock as of December 31, 1984, was approximately $ 3,825,000, and the value of a minority interest as of that date was $ 1,524.76 per share. On the Federal estate tax return, petitioner reported the value of decedent's 334.84 shares of common stock at $ 750 per share, for a total value of $ 251,130. Petitioner reported the preferred stock at a value of $ 25 per share. Respondent determined that the value of the 334.84 shares of decedent's common stock was $ 1,393.58 per share, for a total value of $ 466,626.32, on April 4, 1985. Respondent made various other adjustments, including an adjustment to the value of the preferred stock. The parties subsequently agreed that the value of the preferred stock was $ 33 per share. Prior to March 8, 1990, Duane L. Krug (Krug), a financial analyst for the Internal Revenue Service in Washington, D.C., prepared an appraisal of the fair market value of the common stock owned by decedent at the date of her death. Krug considered the background of the corporation, the economic conditions of the industry, and the financial status of the corporation in valuing the stock. He found only one publicly listed comparable *357 company that was a manufacturer of precision mechanical springs, i.e., The Barnes Group, Inc., which, through its subsidiary, was a competitor of the corporation but was many times larger than the corporation. Krug also identified and analyzed five other comparable companies engaged in manufacture of original equipment for the automotive industry. Krug compared the corporation and the comparable companies using ratios of price to current earnings, price to 5-year average cash flow, and price to book value. He derived a value of $ 2,098 per share for each of the 1,630.52 outstanding common shares of the corporation. After applying a discount for lack of marketability, Krug concluded that the fair market value of decedent's 334.84 shares of American Coil Spring Company as of April 4, 1985, was $ 1,636 per share. On or before March 9, 1990, petitioner secured an appraisal of the common and preferred stock of American Coil Spring Company from William J. Tankersley (Tankersley), a retired attorney who had served 32 years with the Internal Revenue Service. Tankersley incorporated into his appraisal the report by Manufacturers' Appraisal Company as of December 31, 1984. He reviewed *358 the age of the business and history of the corporation, the economic outlook generally and of the specific industry, and the book value and financial condition of the corporation. Tankersley compared a 5-year average earnings per share for the corporation with current earnings per share for six publicly listed companies, five of which were in the wire products business unrelated to the automobile industry. He then multiplied by 9.8 earnings of the corporation, which he had computed as $ 82 per share from 1980 through 1984, to derive a value of $ 803.60 per share, rounded to $ 800 per share. ULTIMATE FINDING OF FACT The fair market value of decedent's shares of common stock of American Coil Spring Company on April 4, 1985, was not less than $ 1,393.58 per share. OPINION Petitioner has conceded all adjustments in the statutory notice other than the value of decedent's common stock in American Coil Spring Company. Petitioner has the burden of proving that respondent's determination is erroneous. Rule 142(a). Valuation Guidelines
*359 Property includable in a decedent's gross estate is generally included at its fair market value on the date of the decedent's death. Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs. The trier of fact must weigh all relevant evidence and draw appropriate inferences. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court; Estate of Andrews v. Commissioner, 79 T.C. 938 (1982). In determining the value of unlisted stocks, actual arm's-length sales of such stock in the normal course of business within a reasonable time before or after the valuation date are the best criteria of market value. Estate of Andrews v. Commissioner, 79 T.C. at 940. *360 Neither petitioner nor respondent argues, however, that sales pursuant to the redemption agreement or the buy-sell agreement are decisive of the value of decedent's stock in this case. In the absence of arm's-length sales, the value of closely held stock should be based upon, in addition to all other factors, the value of listed stock of corporations engaged in the same or a similar line of business. Sec. 2031(b). The value of closely held stock must also be determined indirectly by weighing the corporation's net worth, prospective earning power, dividend-paying capacity, and "other relevant factors." Estate of Andrews v. Commissioner, 79 T.C. at 940; sec. 20.2031-2(f), Estate Tax Regs. These other relevant factors include the goodwill of the business, the economic outlook in the particular industry, the company's position in the industry and its management, and the degree of control represented by the block of stock to be valued. Sec. 20.2031-2(f), Estate Tax Regs., provides: (f) Where selling prices or bid and asked prices are unavailable. If the provisions of paragraphs (b), (c), and (d) of this section are inapplicable because actual sale prices *361 and bona fide bid and asked prices are lacking, then the fair market value is to be determined by taking the following factors into consideration: * * * (2) In the case of shares of stock, the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors. In addition, various factors for consideration in valuing stock of a corporation not traded on a stock exchange or over-the-counter market are set forth in Rev. Rul. 59-60, 1959-1 C.B. 237, 242. The Evidence
Tankersley and Krug, who had prepared appraisals described in our Findings of Fact, were the only witnesses at trial. The Court recognized each of these persons as experts qualified to testify as to the value of the stock. Their valuations had been made the subject of reports exchanged and submitted to the Court prior to trial in accordance with the Standing Pre-Trial Order. At the time Tankersley's report was offered into evidence by petitioner, respondent's counsel objected on the ground that the report did not comply with the requirement of Rule 143(f) that an expert's report set forth in detail the reasons for the conclusion of the expert witness. *362 Specifically, Tankersley's report referred to comparable companies but did not identify them; did not state whether Tankersley used average earnings or a weighted average earnings in his analysis; referred to a standard industrial classification number but did not identify it; and did not explain how he arrived at the price-earnings ratio of 9.8. The Court agreed with the criticism of Tankersley's report and indicated that a timely motion in limine might have been granted if made earlier, when the defect in the report could have been cured, but overruled the objection because sustaining it when the witness began his testimony would have precluded petitioner's presentation of its case. Tankersley's testimony and his report merely reiterated the factors set forth in section 2031(b), in the regulation quoted above, and in Rev. Rul. 59-60 and asserted his conclusion. Tankersley gave us no reason to believe that the fortunes of the corporation would rise and fall with the companies that he used, and his failure to identify any of those companies prior to cross-examination during trial precluded verification of the ratios that he claimed to have derived from them. He did *363 not explain how he calculated the numbers he used or otherwise justify his result. It appeared from his testimony on cross-examination that he had arbitrarily picked a ratio and had erroneously compared average earnings over a 5-year period of the corporation being valued to current earnings of the other companies. Under the circumstances, Tankersley's opinion is unreliable and cannot satisfy petitioner's burden of proving that respondent's determination in the statutory notice was erroneous. Petitioner argues that we should accept Tankersley's testimony because he "specifically states compliance with" section 2031(b), and respondent's expert witness report does not. We cannot, however, accept petitioner's expert's unsupported assertion that, applying the legal standards, the value of the common stock is $ 800 per share. Notwithstanding Tankersley's credentials, his unreasoned expert opinion cannot be relied on by the Court. See Mid-State Fertilizer Co. v. Exchange National Bank of Chicago, 877 F.2d 1333, 1340 (7th Cir. 1989). Krug's opinion, by contrast, provided the information necessary for us to make a reasoned judgment as to the correctness of his *364 approach. In the absence of more than one comparable company engaged in the same line of business, he was correct in comparing the corporation to companies engaged in a similar line of business, i.e., other original automobile equipment manufacturers. See Estate of Hall v. Commissioner, 92 T.C. 312, 339-340 (1989). Petitioner argues that Krug's opinion improperly uses formulas in contravention of Rev. Rul. 59-60. That ruling states, in part, that "No formula can be devised that will be generally applicable to the multitude of different valuation issues arising in estate and gift tax cases." 1959-1 C.B. at 238. That statement does not, as petitioner and its expert assert, prohibit the comparative ratio analysis employed by Krug. Krug's method is consistent with the Code, the regulations, the ruling, and methods adopted by the Court in numerous cases. Petitioner has not raised any valid objection to Krug's methodology or his conclusions, and his conclusions are supported by all of the evidence of value in the record. Respondent's Post-Trial Motion
On March 8, 1990, along with *365 his expert report, respondent submitted a trial memorandum that identified the issue we are dealing with as follows: Whether the fair market value of 334.84 shares of American Coil Spring Company common stock owned by Margaret Jann (decedent) at the date of her death (April 4, 1985) was $ 750.00 per share as reported on the decedent's estate tax return or $ 1,393.58 per share as determined by respondent.
On May 3, 1990, over a month after trial, respondent filed a Motion for Leave to Amend Answer to Conform to the Evidence, seeking to increase the claimed deficiency by $ 30,401, from $ 82,992 to $ 113,393. The basis for the proposed amendment was the $ 1,636 per share value used in Krug's report instead of the $ 1,393.58 per share value used in the statutory notice. Respondent offered no excuse for failure to make his motion to amend prior to trial. Leave to amend is to be given freely when justice so requires. Rule 41(a). Justice is not served when respondent seeks to raise the stakes after trial, when all relevant evidence was in respondent's possession prior to *366 trial. The Motion for Leave to Amend Answer to Conform to the Evidence will, therefore, be denied. Decision will be entered for the respondent.