ESTATE OF HELEN M. TRENCHARD, DECEASED, JOAN TRENCHARD FRENCH, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent ESTATE OF WENDELL B. TRENCHARD, DECEASED, JOAN TRENCHARD FRENCH, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Trenchard v. Commissioner
Docket Nos. 20669-93, 20849-93
United States Tax Court
T.C. Memo 1995-121; 1995 Tax Ct. Memo LEXIS 117; 69 T.C.M. (CCH) 2164; March 22, 1995, Filed *117 Decisions will be entered under Rule 155. Ds, their daughter, and her three children each transferred property to a newly formed, closely held corporation, C, in exchange for debt and stock. Ds received most of C's preferred stock, which gave them approximately 61 percent of C's voting power; their daughter received C's remaining preferred stock and 40 percent of its common stock, which gave her approximately 35 percent of C's voting power; each of the three children received 20 percent of C's common stock, which gave each of them approximately 1 percent of C's voting power. The value of the property that each D transferred to C exceeded the aggregate value of the stock and debt that they each received in return. Held: The excess values that each D transferred to C were gifts to the common shareholders. Values of stock (including control premium), debt, and property determined. Held, further, Ds are both liable for an addition to tax under sec. 6651(a), I.R.C., for failure to file a timely gift tax return with respect to these gifts. For petitioner: Edward F. Sutkowski, Dean B. Rhoads, Wilson C. Washkuhn, and Karl B. Kuppler. For respondent: Darrell C. Weaver. LARO
*118 LARO
MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: Estate of Helen M. Trenchard, Deceased, Joan Trenchard French, Executrix, and the Estate of Wendell B. Trenchard, Deceased, Joan Trenchard French, Executrix, petitioned the Court to redetermine respondent's determinations mentioned below. The Court consolidated the two dockets resulting therefrom into one case for trial, briefing, and opinion. We separately refer to Helen M. Trenchard, Deceased, and Wendell B. Trenchard, Deceased, as Mrs. Trenchard and Mr. Trenchard, respectively, and we collectively refer to them as the decedents. We refer to Joan Trenchard French as the executrix. Rule references are to the Tax Court Rules of Practice and Procedure. Unless otherwise stated, section references are to the Internal Revenue Code in effect for the years in issue. Respondent determined deficiencies in and an addition to the Federal gift tax of Mr. Trenchard as follows: Addition to Tax Tax Period Ended
Deficiency
Section 6651(a)
June 30, 1977
$ 821,051
$ 205,263
Dec. 31, 1978
--  --  Dec. 31, 1979
41,350
--  Dec. 31, 1980
89,723
--  Dec. 31, 1981
104,400
--  Dec. 31, 1982
75,500
--  Dec. 31, 1983
48,900
--  Dec. 31, 1984
48,906
--  Dec. 31, 1985
39,574
--  *119 Respondent also determined deficiencies in and an addition to the Federal gift tax of Mrs. Trenchard as follows: Addition to Tax Tax Period Ended
Deficiency
Section 6651(a)
June 30, 1977
$ 821,051
$ 205,263
Dec. 31, 1978
--  --  Dec. 31, 1979
41,350
--  Dec. 31, 1980
89,723
--  Dec. 31, 1981
104,400
--  Dec. 31, 1982
75,500
--  Dec. 31, 1983
48,900
--  Dec. 31, 1984
48,906
--  Dec. 31, 1985
39,574
--  Dec. 31, 1987
100,063
--  Respondent reflected the first determination in a notice of deficiency issued to Mr. Trenchard on June 29, 1993. Respondent reflected the second determination in a notice of deficiency issued to Mrs. Trenchard on the same date. Following respondent's concession that her determinations for 1978 through 1985 are erroneous, we must decide: 1. Whether the decedents' transfers of property to a closely held corporation in exchange for debentures and preferred stock resulted in gifts to the holders of the corporation's common stock. We hold that the transfers did. [1]
*120 2. Whether the decedents are liable for additions to tax under section 6651(a) for failure to file timely gift tax returns reporting these gifts. We hold that they are. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and attached exhibits are incorporated herein by this reference. The executrix resided in Peoria Heights, Illinois, when she petitioned the Court. Mr. Trenchard was born on April 3, 1900. He graduated from the School of Agriculture at the University of Illinois and was actively involved in the farming and banking industries during most of his life. Mr. Trenchard married Mrs. Trenchard on October 16, 1926, and the two remained married until he died on October 7, 1985. Mr. Trenchard was domiciled in Illinois at the time of his death, and his estate is being administered there. Mrs. Trenchard was domiciled in Illinois at the time of her death on May 30, 1992, and her estate is being administered there. Mrs. Trenchard was born on July 16, 1900. The executrix is the decedents' only child. She was appointed the executrix of the decedents' estates on November 21, 1985, and July 1, 1992, respectively, and has served in *121 that capacity to date. The executrix was born on March 15, 1929, and received a 4-year college degree with a major in history and a minor in English. She married her former husband on August 17, 1951, and they had three children: T. Bondurant French, born July 30, 1952; Strawn T. French, born June 23, 1955; and Penn Hossack French, born September 13, 1960 (hereinafter, these three children are separately referred to as Bon French, Strawn French, and Penn French, respectively, and are collectively referred to as the Children). The executrix divorced her former husband on June 3, 1976, and has never received alimony or support payments from him. Her primary source of income from January 1, 1976, to May 31, 1977, was from the family farm. The Trenchard family has been actively involved in the farming industry in east central Illinois since the late 19th century. On June 1, 1977, the decedents, the executrix, and the Children (collectively referred to as the Subscribers) organized Trenchard Farms, Inc. (Corporation) in the State of Nevada to conduct their farming and related activities. [2] The Subscribers organized Corporation with the advice of their counsel, Edward F. Sutkowski. *122 The Subscribers had first consulted Mr. Sutkowski in 1973 with respect to the formation of Corporation. Immediately before Corporation was organized, the Subscribers collectively owned approximately 1,850 acres of farmland proximately located in east Central Illinois. In connection with Corporation's formation, the Subscribers executed a document entitled "Preincorporation Subscription Agreement" (the Subscription Agreement). [3] *124 The Subscription Agreement acknowledged the fact that Corporation's articles of incorporation authorized it to issue the following shares of stock, all of which were without par value: 75,000 shares of First Preference Stock, 3,000 shares of Second Preference Stock, 2,000 shares of Third Preference Stock, and 20,000 shares of common stock. All shares were entitled to full voting rights, and each share entitled its holder to one vote. The First, Second, and Third Preference Stock had liquidation preferences *123 equal to $ 10, $ 1,000, and $ 1,000 per share, respectively, [4] and each share of preferred stock was callable at 10 percent of the redemption price if redeemed prior to 1982. [5] The preferred stock was entitled to non-cumulative dividends, payable when and to the extent declared by Corporation's board of directors. [6] *125 Holders of common stock were entitled to dividends in a given year, only after the holders of preferred stock were paid their dividends for that year. [7]
The Subscription Agreement provided that each Subscriber would transfer farmland, grain, and livestock to Corporation in exchange for stock and debentures. The Subscription Agreement listed the value of the transferred property as follows: Value of Transferred
Value as Percentage of
[8] Property  Transferred Property
Mr. Trenchard
$ 1,754,550
35.07
Mrs. Trenchard
555,048
11.10
The Executrix
1,575,006
31.48
Bon French
372,671
7.45
Strawn French
372,672
7.45
Penn French
372,672
7.45
Total  5,002,619
100.00
*126 The Subscription Agreement also provided that the value of the shares and debentures that would be received by the Subscribers were as follows: [9]
Mr.
Mrs. The Bon Strawn
Penn
Trenchard
Trenchard
Executrix French
French
French
First
$ 200,000
--  $ 100,000
--   --   --  Preference
Second
700,000
$ 150,000
400,000
--   --   --   Preference
Third
500,000
150,000
400,000
--   --   --   Preference
[1] Debenture 354,500
255,048
[2] 475,00
$ 272,671
$ 272,672
$ 272,672
Common
--   --  200,000
100,000
100,000
100,000
Total  1,754,550
555,048
1,575,000
372,671
372,672
372,672
*127 Neither the value of the stock nor the debentures, as these values appeared in the Subscription Agreement, were ascertained by a professional appraiser. Based on the Subscription Agreement, the post-incorporation voting rights of each Subscriber, vis-a-vis all Subscribers, were: Mr. Trenchard
60.92%
Mrs. Trenchard
.86 The Executrix
33.91 Strawn French
1.44 Penn French
1.44 Bon French
1.44 Total  100.01 (rounding error of .01)  In accordance with the Subscription Agreement, the Subscribers transferred grain, livestock, and the following farmland to Corporation: 1. Mr. Trenchard: a. Three-fourths interest in 160 acres, Southeast Quarter Section 5, Township 19 North, Range 5 East of Third Principal Meridian, Piatt County (Parcel 1); b. Entire interest in 160 acres, Northeast Quarter Section 5, Township 19 North, Range 5 East of Third Principal Meridian, Piatt County (Parcel 2); c. Life interest in 323/333 acres, Northwest Quarter and Southwest Quarter Section 5, Township 19 North, Range 5 East of Third Principal Meridian, Piatt County (Parcel 3); d. Entire interest in 160 acres, East Half Northeast Quarter and East Half of Southeast Quarter of Section *128 6, Township 19 North, Range 5 East of Third Principal Meridian, Piatt County (Parcel 4); e. Entire interest in 49 acres, Lot 2 of Subdivision of North Half of Northeast Quarter of Section 21, Township 19 North, Range 5 of Third Principal Meridian, Piatt County (Parcel 14); f. Entire interest in 80 acres, South Half of Northeast Quarter of Section 21, Township 19 North, Range 5 East of Third Principal Meridian, Piatt County (Parcel 15); g. One-half interest in 79 acres, West Half of Southwest Quarter Section 32, Township 20 North, Range 5 East of Third Principal Meridian, except part of West Half of Southwest Quarter of Section 32, Township 20 North, Range 5 East of Third Principal Meridian (Parcel 17); and h. Entire interest in 40 acres, Southeast Quarter of Northwest Quarter of Section 32, Township 20 North, Range 5 East of Third Principal Meridian, Piatt County (Parcel 18). 2. Mrs. Trenchard: a. One-fourth interest in Parcel 1; b. One-half interest in Parcel 17; and c. Entire interest in 120 acres, North Half of Northwest Quarter and Southwest Quarter of Northwest Quarter of Section 32, Township 20 North, Range 5 East, Third Principal Meridian, Piatt County (Parcel *129 19). 3. The Executrix: a. Remainder interest in Parcel 3; b. One-half interest in 80 acres, South Half of the Southwest Quarter of Section 17, Township 20 North, Range 5 East of Third Principal Meridian, DeWitt County (Parcel 6); c. Entire interest in 40 acres, Southwest Quarter of Southeast Quarter of Section 20, Township 20 North, Range 5 East of Third Principal Meridian, Piatt County (Parcel 7); d. Entire interest in 35 acres, West 17.5 acres of Northeast Quarter of Northeast Quarter and West 17.5 acres of Southeast Quarter of Northeast Quarter Section 20, Township 20 North, Range 5 East of Third Principal Meridian, Piatt and DeWitt Counties (Parcel 8); e. One-half interest in 80 acres, East Half of Southeast Quarter of Section 20, Township 20 North, Range 5 East of Third Principal Meridian, Piatt and DeWitt Counties (Parcel 9); f. One-half interest in 40 acres, Northwest Quarter of Southeast Quarter of Section 20, Township 20 North, Range 5 East of Third Principal Meridian, Piatt and DeWitt Counties (Parcel 10); g. One-half interest in 40 acres, West Half of West Half of Northeast Quarter Section 20, Township 20 North, Range 5 East, Third Principal Meridian (Parcel *130 11); and h. One-half interest in 40 acres, East Half of West Half of Northeast Quarter of Section 20, Township 20 North, Range 5 East of Third Principal Meridian, DeWitt and Piatt Counties (Parcel 13). 4. Strawn French: a. One-third interest in 114 acres, Northeast Quarter and Northwest Quarter of Southeast Quarter of Section 8, Township 19 North, Range 5 East of Third Principal Meridian; and Lot 2 in Northeast Quarter of Southwest Quarter of Section 8, Township 19 North, Range 5 East of Third Principal Meridian, Piatt County (Parcel 5); b. One-half interest in Parcel 11; c. Entire interest in 40 acres, West Half of East Half of Northwest Quarter Section 20, Township 20 North, Range 5 East, Third Principal Meridian (Parcel 12); and d. One-third interest in 154 acres, part of the Southwest Fractional Quarter of Section 31, Township 20 North, Range 5 East of Third Principal Meridian, Piatt and DeWitt Counties (Parcel 16). 5. Penn French: a. One-third interest in Parcel 5; b. One-half interest in Parcel 9; c. One-half interest in Parcel 10; and d. One-third interest in Parcel 16. 6. Bon French: a. One-third interest in Parcel 5; b. One-half interest in Parcel *131 6; c. One-half interest in Parcel 13; and d. One-third interest in Parcel 16. Between 1948 and 1976, Mr. Trenchard gave the executrix all of the farmland that she transferred to Corporation, with the exception of the remainder interest in Parcel 3. The executrix acquired the remainder interest in connection with a prior transfer, in fee simple, to Mr. Trenchard from his father. Between 1959 and 1976, Mr. Trenchard gave the Children all of the farmland that they transferred to Corporation. Before Corporation was organized, Mr. Trenchard managed all of the farmland owned by the Subscribers; neither the executrix nor any of the Children had any significant experience in the management of farm property. Mr. Trenchard also kept track of the income earned and expenses incurred with respect to the land and distributed the profits accordingly. For their 3 taxable years prior to the transfer of the farmland to Corporation, the Subscribers received net income (rounded off to the nearest dollar) from the land as follows: 1974
1975
1976
The Decedents
$ 110,892
$ 136,778
$ 162,793
The Executrix
19,582
21,734
25,197
Bon French
12,997
12,908
14,672
Strawn French
13,511
12,903
13,829
Penn French
--  --  15,547
*132 Corporation paid its debenture holders the following amounts of interest (rounded off to the nearest dollar) during its taxable years ended May 31, 1978, through May 31, 1986: Taxable year
ended May 31
1978
1979
1980
1981
1982
1983
Mr. Trenchard
$ 28,364
$ 28,364
--
$ 56,728
--  $ 14,182
Mrs. Trenchard
20,404
20,404
--
20,404
$ 20,403
10,202
The Executrix
38,000
38,000
--
38,000
57,000
19,000
Bon French
21,814
21,814
--
21,814
32,721
10,907
Strawn French
21,814
21,814
--
21,814
32,721
10,907
Penn French
21,814
21,814
--
21,814
32,721
10,907
Taxable year
ended May 31
1984
1985
1986
Mr. Trenchard
$ 35,455
$ 21,273
$ 70,910
Mrs. Trenchard
25,504
15,302
34,605
The Executrix
47,500
28,500
57,000
Bon French
27,267
16,360
32,721
Strawn French
27,267
16,360
32,721
Penn French
27,267
16,360
32,721
For those years, Corporation's board of directors also approved the following compensation for its officers: [10]
Taxable year
ended May 31
1979
1980
1981
1982
1983
1984
President
$ 20,000
$ 50,000
$ 50,000
$ 50,000
$ 50,000
$ 50,000
Vice president
--
--
--
--
--
--
Secretary
21,000
25,000
14,000
12,000
20,000
20,000
Treasurer
--
--
--
--
--
--
*133 Taxable year
ended May 31
1978
1985
1986
President
$ 24,000
$ 12,000
$ 12,000
Vice president
--
--
--
Secretary
12,000
24,000
24,000
Treasurer
--
--
--
Corporation reported taxable income (loss) of $ 51,713, ($ 49,646), $ 144,229, and ($ 175,516) for its taxable years ended May 31, 1978, through May 31, 1981, respectively. For those 4 years, Corporation paid Mr. Trenchard officer compensation of $ 20,000, $ 45,000, $ 50,000, and $ 50,000, respectively, and it paid the executrix officer compensation of $ 19,100, $ 20,000, $ 14,000, and $ 12,000, respectively. Mr. Trenchard filed gift tax returns for periods during 1959, 1961, 1963, 1964, 1967, and 1976; the 1959 through 1967 returns were prepared by his personal attorney, Robert Shonkwiler, *134 and his 1976 return was prepared by a second attorney, J. Michael O'Byne. Mr. Trenchard reported on these returns gifts of real estate totaling $ 601,628; with respect to these gifts, he paid gift taxes aggregating $ 47,883 (not taking into account the gift taxes paid by Mrs. Trenchard on account of "splitting" the gifts with her husband). Mr. Trenchard obtained two appraisals in connection with his gifts of farmland in 1976. Of the farmland that the decedents transferred to Corporation in 1977, these two appraisals related only to Parcel 17. The value in the Subscription Agreement for Parcel 17 equaled the average of the two appraisals. Neither of the decedents filed a Federal gift tax return for any of the periods ended December 31, 1979, through December 31, 1985, until gift tax issues were raised by respondent. On or about July 18, 1989, gift tax returns for those periods were filed by: (1) The executrix, on behalf of Mr. Trenchard and consented to by Mrs. Trenchard, and (2) Mrs. Trenchard, on behalf of herself and consented to by the executrix on behalf of Mr. Trenchard. OPINION This case focuses on the valuation of property transferred to and from Corporation during *135 its formation. Given the fact that the parties dispute the properties' valuation, the first task of this Court, as the trier of fact, is to find the properties' fair market value. As typically occurs in a case of valuation, the parties rely on the testimony and reports of experts to support the parties' contrary positions on the valuation issues. Expert testimony sometimes aids the Court in determining valuation. Other times, it does not. [11] The Court is not bound by an opinion of an expert. We weigh an expert's testimony in light of his or her qualifications, as well as with respect to all other credible evidence in the record. Depending on what we believe is appropriate under the facts and circumstances of the case, we may either reject an expert's opinion in its entirety, accept it in its entirety, or accept only selective portions of it. Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Technology v. Commissioner, 102 T.C. 149, 186 (1994); Parker v. Commissioner, 86 T.C. 547, 562 (1986). *136 The executrix bears the burden of proving respondent's determination of valuation incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Estate of Gilford v. Commissioner, 88 T.C. 38, 50-51 (1987). The executrix must introduce sufficient evidence to: (1) Make a prima facie case establishing that respondent committed the errors alleged in the petition and (2) overcome the evidence favorable to respondent. Lyon v. Commissioner, 1 B.T.A. 378, 379 (1925). Valuation is a question of fact, and the trier of fact must weigh all relevant evidence to draw the appropriate inferences. Commissioner v. Scottish American Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., supra at 294; Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244; Skripak v. Commissioner, 84 T.C. 285, 320 (1985). Fair market value is defined for both estate tax and gift tax purposes to mean the price that *137 a willing buyer would pay a willing seller, both persons having reasonable knowledge of all the relevant facts and neither person being under a compulsion to buy or to sell. Sec. 20.2031-1(b), Estate Tax Regs.; see also United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Frieders v. Commissioner, 687 F.2d 224, 226 (7th Cir. 1982), affg. T.C. Memo. 1980-184; Snyder v. Commissioner, 93 T.C. 529, 539 (1989); Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989). The willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and the individual characteristics of these hypothetical persons are not necessarily the same as the individual characteristics of the actual seller or the actual buyer. First Natl. Bank v. United States, 763 F.2d 891, 893-894 (7th Cir. 1985); Estate of Curry v. United States, 706 F.2d 1424, 1428-1429, 1431 (7th Cir. 1983); Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); *138 Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990). For Federal gift tax purposes, the fair market value of the subject property is determined as of the date of the gift, and, ordinarily, no consideration is given to any unforeseeable future event that may have affected the value of the subject property. Sec. 2512(a); sec. 20.2031-1(b), Estate Tax Regs; see also First Natl. Bank v. United States, supra at 893-894; United States v. 105.40 Acres of Land, 471 F.2d 207 (7th Cir. 1972); Estate of Newhouse v. Commissioner, supra at 218. Fair market value reflects the highest and best use of the property on the valuation date. Fair market value takes into account special uses that are realistically available due to the property's adaptability to a particular business. Mitchell v. United States, 267 U.S. 341, 344-345 (1925); Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986). Fair market value is not affected by whether the owner has actually put the property to its highest and best *139 use. The reasonable and objective possible uses for the property control the valuation thereof. United States v. Meadow Brook Club, 259 F.2d 41, 45 (2d Cir. 1958); Stanley Works v. Commissioner, supra at 400; see also Smoot v. United States, 892 F.2d 597, 599 (7th Cir. 1989). With these general principles in mind, we proceed to decide the two issues at hand. Issue 1. The Decedents' Transfers of the Farmland to Corporation
a. Transfers in the Ordinary Course of Business
The Code imposes a tax on property transferred by gift. Sec. 2501(a); see also sec. 2511(a). According to the Code, "Where the property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift". Sec. 2512(b). Section 2513 permits gifts made to a third party by a husband or wife to be treated for gift tax purposes as though each spouse had made a gift of one-half of the total value of the gifts. The breadth of the Federal gift tax provisions may exceed the *140 reach of the term "gift" under the common law. Whereas a gift in the common law sense requires a donative intent, delivery by the donor, and acceptance by the donee, 38 Am. Jur.2d, Gifts, sec. 18 (1968), a gift for Federal gift tax purposes encompasses sales and other exchanges of property in which the value of the property transferred is more than the value of the consideration received. Sec. 25.2512-8, Gift Tax Regs. As stated by the Supreme Court, the "Congress intended to use the term 'gifts' in its broadest and most comprehensible sense", and "dispensed with the test of 'donative intent'" in lieu of "a much more workable external test, that where 'property is transferred for less than an adequate and full consideration in money or money's worth,' the excess in such money value 'shall, for purposes of the gift tax imposed by this title, be deemed a gift'". Commissioner v. Wemyss, 324 U.S. 303, 306 (1945); see also Crown v. Commissioner, 585 F.2d 234, 238 (7th Cir. 1978), affg. 67 T.C. 1060 (1977). Respondent determined that each of the decedents made gifts of corporate equity to the executrix *141 and the Children upon the formation of Corporation, and that one-half of each gift is treated as separately made by each spouse under section 2513. The executrix disagrees with respondent's determination. The executrix primarily argues that the Federal gift tax provisions do not apply to the facts at bar. According to the executrix, the decedents' transfers to Corporation are outside the reach of the Federal gift tax provisions because Corporation's formation was a genuine business transaction. The executrix alleges in her brief that she initiated the formation of Corporation so that she could manage the family business after Mr. Trenchard was unable to do so. The executrix also alleges in her brief that the formation of Corporation was sound from a business point of view because it simplified the allocations to the Subscribers of the income and expense connected to the farmland, [12] allowed the business assets to remain together, prevented the owner of a parcel from selling his or her interest and impairing the family business without the consent of a majority of the family, and allowed the decedents to protect themselves from a decline in the real estate market (by exchanging *142 their farmland for preferred stock). The executrix further alleges in her brief that the decedents transferred their farmland to Corporation in exchange for stock and debentures that they believed equaled the value of the land and, to the extent that the value of the transferred property exceeded the value of the consideration received in return, the decedents merely made a bad business decision. The executrix relies on the fact that the Federal gift tax does not reach a transfer of property made in the ordinary course of business. Sec. 25.2512-8, Gift Tax Regs. A transfer is in the ordinary course of business if it is bona fide, at arm's length, and free from donative intent. Id.
We disagree with the executrix' contention that the formation of Corporation was in the ordinary course of business within the meaning of respondent's *143 regulations. We closely scrutinize a transfer involving related parties, such as family members and their closely held corporation, to determine whether the transfer is a gift. We presume that such a transfer is a gift. See Frazee v. Commissioner, 98 T.C. 554, 561 (1992); Harwood v. Commissioner, 82 T.C. 239, 258 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Estate of Reynolds v. Commissioner, 55 T.C. 172, 201 (1970), and the cases cited therein; see also Estate of Muhammad v. Commissioner, 965 F.2d 520, 521 (7th Cir. 1992), affg. T.C. Memo. 1990-211. The executrix has failed to overcome this presumption. She has failed to convince us that the decedents' transfers of their farmland to Corporation without meaningful arm's-length bargaining was bona fide, at arm's length, and free from donative intent. See Harwood v. Commissioner, supra at 258, 259. We find any testimony to the contrary elicited from the executrix and Bon French to be uncorroborated, *144 self-serving, and unpersuasive. Under the circumstances, we are not required to, and we do not, rely on that testimony to support the executrix' positions herein. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). In addition to the lack of evidentiary support for the executrix' assertion that the formation was not a gift, we find relevant the facts that: (1) Mr. Trenchard had a long history of giving parcels of land to his family; (2) the executrix, his only child, had recently divorced and was dependent on the income from the family farm; (3) none of the Subscribers, other than Mr. Trenchard, was a farmer or had managed the land that he or she had previously been given by Mr. Trenchard; and (4) Mr. Trenchard was conscious of estate planning and was seeking ways to reduce his Federal estate tax. The executrix has also not convinced us that the decedents would have transferred their farmland to Corporation if its other shareholders had been unrelated to them. We find incredible the proposition espoused by the executrix that a shareholder who was unrelated to his or her fellow shareholders, would: (1) Transfer the present income from, and economic *145 use of, hundreds of acres of farmland in return for fixed-yield, unsecured notes and noncumulative preferred stock that pays no current income, (2) accept noncumulative preferred stock that he or she knows (or has reason to know) will not pay dividends, and (3) consummate an exchange of property that would significantly reduce the current income that he or she received from the relinquished property. We conclude that the decedents' transfers to Corporation were gifts that are subject to the Federal gift tax. We proceed to ascertain the fair market value of both the property that each of the decedents transferred to Corporation, and the consideration that each of them received in return, to determine the amount (if any) of their gifts. b. Value of the Decedents' Properties Transferred to Corporation
Respondent determined that the value of the farmland transferred to Corporation by Mr. and Mrs. Trenchard was $ 2,551,770 and $ 715,500, respectively. [13] *147 The executrix challenged this determination through the testimony of her expert, John T. Scott, Jr., Ph.D. [14] Professor Scott, who was recognized by the Court as an expert in farm real estate, is a Professor of Land Economics *146 and Farm Management at the University of Illinois. He is also chairman of the Illinois Tax Advisory Committee to the Illinois Department of Revenue, with respect to real estate taxes. In June 1993, Professor Scott inspected all of the farmland that the Subscribers transferred to Corporation. Based on his inspection, and on certain other analyses that he conducted with respect to the land, Professor Scott concluded that the June 1, 1977, value of the land that the Subscribers transferred to Corporation was $ 5,741,151. Of this amount, Professor Scott concluded that $ 2,895,826 and $ 673,875 (or a total of $ 3,569,701) were attributed to the land transferred by Mr. and Mrs. Trenchard, respectively. Professor Scott noted that his valuation of Mr. Trenchard's interest in Parcel 3 did not take into account the fact that he owned only a life interest in the parcel. Respondent attempted to support her determination with the testimony of her expert, Donald M. Nelson, accredited rural appraiser. Mr. Nelson received undergraduate and graduate degrees in agriculture from the University of Minnesota, and has been appraising land since 1955. Mr. Nelson valued the decedents' farmland by means of an analysis that was similar to the analysis performed by Professor Scott. Mr. Nelson concluded that the June 1, 1977, values of the farmland transferred by Mr. and Mrs. Trenchard were $ 3,350,300 and $ 715,500, respectively (or a total of $ 4,065,800). As *148 was true with Professor Scott's valuation, Mr. Nelson's valuation does not take into account the fact that Mr. Trenchard owned only a life interest in Parcel 3. We find that both experts are proficient on the valuation of real estate. We also find many similarities in their analysis, reports, testimony, and conclusions with respect to the subject property. [15] We believe, however, that Professor Scott is more knowledgeable than Mr. Nelson on the valuation of the farmland at hand, and we are more persuaded by the conclusions reached in Professor Scott's report. We conclude that the June 1, 1977, value of the farmland transferred to Corporation by the decedents equals the amount that he determined, with one modification. With respect to Professor Scott's valuation of Mr. Trenchard's interest in Parcel 3, we must reduce Professor Scott's value to take into account the fact that Mr. Trenchard only owned a life interest in the property. We multiply the actuarial factor of .31327, see sec. 20.2031-10(f) Table (A)(1), Estate Tax Regs., by Professor Scott's value of $ 1,028,151 to ascertain that Mr. Trenchard's life interest in Parcel 3 was worth $ 322,089 on the day of Corporation's *149 formation. In summary, we find that the value of the property transferred by the decedents to Corporation equaled the following on June 1, 1977, the day of Corporation's formation: Mr. Trenchard
Mrs. Trenchard
Total
Grain/Livestock
$ 75,426
$ 13,683
$ 89,109
Farmland
2,189,764
673,875
2,863,639
Total   2,265,190
687,558
2,952,748
c. Value of Stock and Debentures Received by the Decedents
Respondent determined that *150 Mr. and Mrs. Trenchard received $ 779,821 and $ 278,130, respectively, in preferred stock and debentures upon Corporation's formation. [16] *151 The executrix challenged this determination through the testimony of her expert, Scott Nammacher. Mr. Nammacher, who received a business degree from the University of Minnesota in 1977 and a Master of Business Administration from New York University in 1985, concluded that the June 1, 1977, values of the preferred stock and debentures received by Mr. and Mrs. Trenchard equaled $ 913,625 and $ 322,995, respectively. [17] Mr. Nammacher also concluded that Mr. Trenchard acquired an intangible asset, upon Corporation's formation, in the form of his voting and operating control. Mr. Nammacher valued this intangible asset at $ 904,300. [18]
*152 We are generally not persuaded by Mr. Nammacher's opinion on the value of the decedents' preferred stock and debentures. Nevertheless, we independently agree with his conclusion that the value of Mr. Trenchard's preferred stock commands a premium for his operating and voting control. Mr. Nammacher ascertained that Mr. Trenchard's preferred stock was entitled to such a premium in the amount of $ 904,300. Respondent did not determine any premium for Mr. Trenchard's preferred stock. Respondent computed the value of Mr. Trenchard's preferred stock by using the same mechanical test that she used to compute the value of Mrs. Trenchard's preferred stock. We generally disagree with respondent's method of computing the value of Mr. Trenchard's preferred stock. Given that his preferred stock entitles the holder to 60.92 percent of Corporation's voting rights, we are convinced that its value cannot be ascertained solely by multiplying the value of one share of preferred stock by the number of shares that Mr. Trenchard held. Simply valuing Mr. Trenchard's preferred stock by using a mechanical test, as determined by respondent, fails to give regard to the value added to his shares on account *153 of the control that inheres therein. Estate of Chenoweth v. Commissioner, 88 T.C. 1577, 1589 (1987); accord Rev. Rul. 59-60, 1959-1 C.B. 237, 242 (controlling interest in closely held company may command a higher price than a minority interest). Therefore, we proceed to determine the fair market value of Mr. Trenchard's preferred stock on the date of Corporation's formation, taking into account the fact that his stock represents a controlling interest in Corporation. We begin our inquiry by looking to the value determined by respondent. The executrix has not disproved it. Respondent discounted the "par value" of Mr. Trenchard's preferred stock, apparently to reflect the stock's lack of marketability. [19] Such a discount is warranted here given the absence of an established market for any shares of Corporation, which is unlisted and closely held by the Subscribers. See Estate of Piper v. Commissioner, 72 T.C. 1062, 1085 (1979). A discount for lack of marketability reflects the absence of a recognized market for closely held stock and accounts for the fact that closely held *154 stock is generally not readily transferable. A premium for control, on the other hand, reflects a shareholder's ability to control a corporation through his or her dictation of its policies, procedures, or operations. The value for control is separate from, and independent of, any discount that may apply for a lack of marketability. The mere fact that the stock held by a controlling shareholder allows him or her to control the underlying corporation does not mean that the stock is any more or less marketable than if the controlling shareholder did not have this control. Mr. Nammacher valued Mr. Trenchard's control at $ 904,300, *155 or, stated differently, almost 138 percent greater than Mr. Nammacher valued the underlying stock. Mr. Nammacher determined the value of the premium by relying primarily on his assumption that Mr. Trenchard's control allowed him to: (1) Liquidate Corporation at will to realize his stock's liquidation value or (2) set his own compensation. We are not persuaded by either the value that Mr. Nammacher computed for the control premium or his analysis related thereto. We disagree with Mr. Nammacher's assumption that Mr. Trenchard could have liquidated Corporation at will. In addition to numerous limitations in Corporation's by-laws that Mr. Trenchard would have had to overcome to cause a liquidation of Corporation, Mr. Trenchard would have been subject to a duty of loyalty to the minority shareholders. See Pepper v. Litton, 308 U.S. 295, 306 (1939); Lebold v. Inland Steel Co., 125 F.2d 369 (7th Cir. 1941); Foster v. Arata, 325 P.2d 759, 764-765 (Nev. 1958); see also Estate of Curry v. United States, 706 F.2d 1424, 1430-1431 (7th Cir. 1983) ("it is settled law *156 that the power to cause such extraordinary corporate actions as dissolution or liquidation may not be exercised without scrupulous loyalty to the interests of minority shareholders"). Such a duty would not have allowed Mr. Trenchard to have easily caused a liquidation of Corporation solely in order for him to have realized any benefit that was related thereto. We are also not persuaded by Mr. Nammacher's assumption that Mr. Trenchard's preferred stock allowed him to set his own compensation. Mr. Trenchard would again have been bound by this same duty of loyalty to his fellow shareholders. In addition, we generally do not find that Corporation had sufficient earnings, during the years in issue, to have allowed Mr. Trenchard to have set a substantially larger salary for himself without generating a taxable loss for Corporation. We also are not unmindful that Corporation was required to pay interest annually on its debentures, and Mr. Trenchard would have been inviting a challenge from the debenture holders to the extent that he appropriated corporate funds that could have been used to pay that interest. Based on the testimony of the parties' experts, we are unable to determine *157 directly the value of Mr. Trenchard's control. Because we are convinced that Mr. Trenchard's preferred stock commanded an additional value for control, we must proceed to determine this additional value. We resort to our "Solomon-like" powers to do so. [20] Respondent did not determine a value for Mr. Trenchard's premium. We find this lack of a determination unrealistic. The executrix, through her expert, concluded that Mr. Trenchard's control was worth 138 percent of the value of the underlying stock. We find this percentage exorbitant. See, e.g., Estate of Salsbury v. Commissioner, T.C. Memo. 1975-333 (51.8 percent voting interest in family corporation carried a 38.1 percent premium for control); Dooly v. Commissioner, T.C. Memo. 1972-164 (majority shares valued at 50 percent more than minority shares because majority block could control business operation); Anderson v. Commissioner, T.C. Memo. 1972-125 (majority shares valued at 20 percent more than minority shares). Based on the record as a whole, and through the use of our best judgment, we believe that Mr. Trenchard's control is *158 worth 40 percent of the value that respondent otherwise determined for his preferred stock. Thus, we hold that the value that respondent determined for Mr. Trenchard's First, Second, and Third Preference Preferred Stock must be increased by $ 32,000, $ 112,000, and $ 80,000, respectively, to accurately reflect the stocks' value on June 1, 1977. [21]
*159 In summary, we determine that the value of the decedents' stock and debentures on the day of Corporation's formation was as follows: Mr. Trenchard
Mrs. Trenchard
Total
8% Debentures
$ 219,821
$ 158,130
$ 377,951
Preferred Stock:
First Preference  112,000
--- 112,000
Second Preference  392,000
60,000
452,000
Third Preference  280,000
60,000
340,000
Total
1,003,821
278,130
1,281,951
d. Effect of Greater Value Surrendered than Received
The value of the property that each of the decedents transferred to Corporation exceeded the value of the stock and debentures that they each received in return. Respondent determined that the excess values are gifts from each of the decedents to the executrix and the Children. The executrix disagrees. According to the executrix, the excess values are not gifts because the decedents' proportionate interests in all of the property transferred to Corporation did not exceed their interests in the total consideration that the Subscribers received in return. The executrix concludes that neither of the decedents made a gift upon the formation of Corporation, although they may have surrendered more value than they *160 received. The executrix relies on section 1.351-1(b)(1), Income Tax Regs., to support her theory. As applied to the facts at hand, we are unpersuaded by the executrix' novel theory. First, her reliance on section 351 is misplaced. Section 351 applies to the income tax consequences of a transfer to a controlled corporation and does not control the gift tax issues that may flow therefrom. Kincaid v. United States, 682 F.2d 1220, 1225 at n.10 (5th Cir. 1982). Second, section 1.351-1(b)(1), Income Tax Regs., the regulations on which the executrix relies, do not stand for the broad proposition that she espouses. Contrary to her assertions, the regulations do not refer to a proportionality of interests. The regulations refer to value. As stated therein, when A transfers $ 8,000 of property to a newly organized corporation in exchange for $ 2,000 of stock, and B transfers $ 2,000 of property for $ 8,000 of stock, the transaction will be subject to the Federal gift tax provisions if A made a gift to B. Sec. 1.351-1(b)(2), Example (1), Income Tax Regs. The executrix' theory further misses the mark because it fails to take into account the fact *161 that the value of the property transferred to Corporation must equal the aggregate value of the preferred stock, debentures, and common stock received in return. [22] To the extent that the value of all of the property transferred to Corporation exceeds the value of the preferred stock and debentures transferred to the Subscribers, the excess value naturally accrues to the benefit (and increases the value) of the common shareholders, of which neither of the decedents was one. The executrix basically asks us to ignore this excess value for purposes of determining whether the decedents made gifts to their fellow shareholders. This, we will not do. Corporation's assets must always equal its liabilities plus its shareholders' equity. Therefore, to the extent that the value of the property transferred to Corporation exceeds the value of its preferred stock and debentures transferred in return, the excess increases the value of the common stock held by the executrix and the Children. Because the value of the property transferred by each of the decedents to Corporation exceeded the value of the stock and debentures that they each received in return, the excess values flowing to the common *162 shareholders are gifts for which the decedents are subject to the Federal gift tax provisions. Kincaid v. United States, supra at 1224; Hollingsworth Trust v. Commissioner, 86 T.C. 91 (1986); see also Estate of Hitchon v. Commissioner, 45 T.C. 96, 104 (1965) (Tannenwald, J., concurring); sec. 25.2511-1(h)(1), Gift Tax Regs. In summary, the amount of the gifts (before taking into account the application of section 2513) is as follows: Mr.
Mrs. Trenchard
Trenchard
Total
Property transferred:
Grain/Livestock $ 75,426
$ 13,683
$ 89,109
Farmland 2,189,764
673,875
2,863,639
Total  2,265,190
687,558
2,952,748
Consideration Received:
8% Debentures 219,821
158,130
377,951
Preferred Stock:
First Preference 112,000
--
112,000
Second Preference 392,000
60,000
452,000
Third Preference 280,000
60,000
340,000
1,003,821
278,130
1,281,951
Excess Treated as a Gift
1,261,369
409,428
1,670,797
*163 Issue 2. Failure to File Timely Gift Tax Returns
Respondent determined additions to tax under section 6651(a) for the decedents' taxable period ended June 30, 1977. Respondent determined that the decedents each failed to file timely a Federal gift tax return for that period, and that neither of the decedents established that his or her failure was due to reasonable cause. The executrix replies that the decedents' failure to file timely Federal gift tax returns for 1977 was due to reasonable cause. The executrix argues in her brief that the decedents reasonably believed that they were consummating a business transaction and that no gift tax returns were required to be filed in connection therewith. The executrix also argues in her brief that the decedents organized Corporation upon advice of counsel and relied on a professional appraisal concerning the value of the farmland transferred to Corporation. An individual was required to file a Federal gift tax return for any quarter before the 1982 calendar year, in which he or she made a gift that was not otherwise excluded from reporting under the Code. [23] The due dates for these returns were May 15, August 15, November 15, *164 and February 15. Secs. 6019, 6075(b); see also sec. 25.6075-2(a), Gift Tax Regs. Individuals who are required to file a timely gift tax return, but do not, are subject to an addition to tax equal to 5 percent of the amount of tax that should have been shown on the return, if the failure to file is for no more than 1 month, with another 5 percent for each month the failure continues, subject to a maximum of 25 percent. No addition to tax is imposed, however, if the individual proves that his or her failure to file timely was: (1) Due to reasonable cause and (2) not due to willful neglect. Sec. 6651(a)(1.); Rule 142(a); United States v. Boyle, 469 U.S. 241, 245 (1985); Estate of Fleming v. Commissioner, 974 F.2d 894, 896 (7th Cir. 1992), affg. T.C. Memo. 1989-675; Autin v. Commissioner, 102 T.C. 760, 776 (1994); Estate of Reynolds v. Commissioner, 55 T.C. 172, 203 (1970). *165 Failure to file timely is due to reasonable cause if the individual exercised ordinary business care and prudence and, nevertheless, was unable to file his or her gift tax return within the prescribed time. Willful neglect means a conscious, intentional failure or reckless indifference. United States v. Boyle, supra at 245; Autin v. Commissioner, supra at 776; sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Whether a failure to file timely a gift tax return was due to reasonable cause, and not to willful neglect, is a factual matter to be decided based on the facts and circumstances of each case. Respondent's determination of an addition to tax for failure to file timely is presumed to be correct, and the individual must disprove respondent's determination. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Autin v. Commissioner, supra at 776; Epstein v. Commissioner, 53 T.C. 459, 477 (1969). An individual may establish reasonable cause for failing to file timely a Federal gift tax return if the facts show *166 that he or she reasonably relied on competent professional advice. Such is true even though the advice proves to be erroneous. United States v. Boyle, supra at 251; Ballard v. Commissioner, 854 F.2d 185, 189 (7th Cir. 1988), revg. on other grounds T.C. Memo. 1987-128; Autin v. Commissioner, supra at 776. With this well-settled principle in mind, we look to the facts at bar. After a careful review of these facts, we are not persuaded that the decedents failed to file timely Federal gift tax returns by virtue of their alleged reliance on professional advice. Although the decedents may have organized Corporation with the advice of their counsel, Mr. Sutkowski, the executrix has not sufficiently shown us that any of this advice focused on the decedents' Federal gift tax liabilities with respect to the formation. Indeed, the record indicates that Mr. Trenchard's personal gift tax returns prior to the years in issue were prepared by his personal attorneys, Messrs. Shonkwiler and O'Byne, rather than Mr. Sutkowski. The executrix has also not argued (and we *167 have not found) that the decedents sought professional advice as to whether they needed to file Federal gift tax returns for the transfers at issue, or whether a professional advised them that they need not file Federal gift tax returns to report these transfers. We are also not persuaded that the decedents determined the values assigned to the farmland in the Subscription Agreement by reasonably relying on a professional's appraisal. Although Mr. Trenchard obtained an appraisal of some of his farmland for purposes of his gift in 1976, this land, with the exception of Parcel 17, was not the farmland that the decedents transferred to Corporation in 1977. To the extent that Mr. Trenchard "appraised" the farmland transferred in 1977 by looking to the 1976 appraisal, we give his 1977 "appraisal" little weight. The executrix has not demonstrated that Mr. Trenchard could value accurately the farmland transferred in 1977, or that the value of the unappraised parcels could be correctly determined by a lay person by reference to the land that was appraised in 1976. [24] Moreover, Mr. Trenchard's self-interest in valuing the transferred farmland himself to reach the result he desired is *168 obvious. We conclude that it was unreasonable for the decedents to believe that the transfers at issue were not gifts. The record demonstrates that the decedents should have known that the value of the farmland that they each transferred to Corporation exceeded the value of the stock and debentures that they each received in return. We find the executrix' testimony to the contrary to be uncorroborated and self-serving. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Accordingly, we sustain respondent's determination *169 with respect to this issue. We have considered all arguments made by the parties and, to the extent not discussed above, find them to be without merit. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. A Rule 155 computation will be necessary to correct the understatement of Mrs. Trenchard's prior taxable gifts, and the gift tax attributable thereto, on her 1987 Federal gift tax return.↩
2. Corporation was qualified to do business in the State of Illinois on Sept. 7, 1978.↩
3. Approximately 14 months later, on Aug. 12, 1978, the Subscribers and Corporation entered into a second agreement, entitled "Trenchard Farms, Inc. Multi-Class Restrictive Share Purchase Agreement" (the Purchase Agreement). The Purchase Agreement, which provided that it was effective as of June 1, 1977, restricted the right of a Subscriber to transfer his or her shares without the prior written consent of the other Subscribers and Corporation. The Purchase Agreement also prohibited Corporation from engaging in the following acts without the unanimous consent of the Subscribers: Declaring or paying a cash or stock dividend; issuing additional shares of stock; issuing shares of stock to any person without requiring the transferee to adopt the Purchase Agreement; reorganizing its capital structure, except to reduce its capital; merging or consolidating with any other corporation; and selling or mortgaging substantially all of its assets.↩
4. Holders of First Preference Stock were entitled to receive their entire liquidation preference before holders of the other two classes of preferred stock were entitled to receive any liquidation proceeds. Holders of Second Preference Stock were entitled to receive their entire liquidation preference immediately after the First Preference Stock, and the holders of Third Preference Stock were then entitled to receive their entire liquidation preference. Holders of common stock were entitled to share ratably in any assets that remained after the preference rights of the preferred shareholders had been satisfied.↩
5. This 10 percent amount was reduced, but not below zero, by 1 percent for each taxable year of Corporation after 1981.↩
6. With respect to each taxable year of Corporation, dividends, if declared, had to first be paid to holders of First Preference Stock, then to holders of Second Preference Stock, and then to holders of Third Preference Stock. The dividend rate for each share of preferred stock equaled that share's redemption price multiplied by the current prime rate of a certain bank. Interest did not accrue on any preferred stock dividends that were declared by Corporation's board.↩
7. The preferred stock had a slight dividend paying capacity when Corporation was organized, and the Subscribers did not expect Corporation to generate enough income to pay dividends. Corporation has paid no dividends to date.↩
8. The amount of this value that the Subscription Agreement attributed to grain and livestock was as follows: ↩
Mr. Trenchard
$ 75,426
Mrs. Trenchard
13,683
The Executrix
16,843
Bon French
9,263
Strawn French
9,263
Penn French
9,264
Total  133,742
9. The values of the stock and debentures as set forth in the Subscription Agreement appear below: ↩
First Preference Stock
$ 10 per share
Second Preference Stock
1,000 per share
Third Preference Stock
1,000 per share
Common Stock
200 per share
Debentures
Valued at face
1. Each debenture provided that the principal listed therein was payable in full on May 31, 1987. Interest accrued on principal at the rate of 8 percent per annum, and accrued interest was payable on each May 31. Debenture holders were not entitled to vote on corporate matters.↩
2. The principal of the debenture issued by Corporation to the executrix was $ 475,006. The parties have not explained the $ 6 difference.↩
10. The decedents were Corporation's only officers on May 31, 1985. From June 1, 1977, through May 31, 1984, Corporation's president, vice president, secretary, and treasurer were Mr. Trenchard, Mrs. Trenchard, the executrix, and Bon French, respectively.↩
11. For example, expert testimony is not useful to the Court when the expert is merely an advocate for the position argued by the party. Laureys v. Commissioner, 92 T.C. 101, 129↩ (1989).
12. The executrix contends that the allocations were difficult before incorporation because many of the tracts were jointly owned and some of the liabilities related to more than one parcel.↩
13. The notices of deficiency issued to the decedents do not reflect any determination with respect to the $ 75,426 and $ 13,683 of grain and livestock that the decedents claimed they transferred to Corporation. Given that respondent's pleadings are also silent on this issue, we hold without further discussion that the value of the grain and livestock was correctly reported.↩
14. The executrix also challenged this determination through the testimony of a second "expert", Scott Nammacher. We give little weight to the opinion of Mr. Nammacher with respect to the value of the farmland. Mr. Nammacher was recognized by the Court as an expert only with respect to a valuation of Corporation's securities, and he has not shown us that he is competent to value real estate. Indeed, Mr. Nammacher informed the Court at the beginning on his testimony that he was only valuing financial instruments.↩
15. Their conclusions on the value of the decedents' farmland is summarized below: ↩
Professor
Mr. Nelson's
Parcel No.
Owner(s) Scott's Value
Value Difference
1
The Decedents
$ 512,000
$ 572,000
$ 60,000
2
Mr. Trenchard
536,000
576,000
40,000
3
Mr. Trenchard
1,028,151
1,162,800
134,649
4
Mr. Trenchard
480,000
547,200
67,200
14,15
Mr. Trenchard
191,800
334,800
143,000
17
The Decedents
311,750
305,000
(6,750)
18
Mr. Trenchard
120,000
148,000
28,000
19
Mrs. Trenchard
390,000
420,000
30,000
Total  3,569,701
4,065,800
496,099
16. Respondent determined these values as follows: Mr. Trenchard
Mrs. Trenchard 8% Debentures:
Face Value of Note  $ 354,550
$ 255,048
Present Value Factor  x .62
x .62
(5% risk premium)   Valuation  219,821
158,130
Preferred Stock:
First Preference  20,000 shares X 40% of par value   80,000
--  Second Preference  700 shares X 40% of par value   280,000
--  150 shares X 40% of par value   --  60,000
Third Preference  500 shares X 40% of par value   200,000
--  150 shares X 40% of par value--     60,000
560,000
120,000
Total
779,821
278,130
Although respondent's notices of deficiency refer to "par value", the preferred stock shares were issued without a par value. We conclude that respondent's use of the term "par value" refers to the values in the subscription agreement that were assigned to the shares.↩
17. Mr. Nammacher conclusion is as follows: Mr. Trenchard
Mrs. Trenchard 8% Debentures: Mr. Nammacher concluded that the value of the debentures equaled the net present value of 40 equal quarterly payments of interest, plus the net present value of the principal due at the end of the term. He used a discount rate of 13%.
[1]
$ 256,125
$ 184,245
Preferred Stock: Mr. Nammacher discounted the face value of the First, Second, and Third Preference Stock by 50%, 52.5%, and 55%, respectively, to reflect a lack of control and marketability.
[2]↩
First Preference  20,000 shares X 50% of face value  100,000
--  Second Preference  700 shares X 52.5% of face value  332,500
--  150 shares X 52.5% of face value  71,250
Third Preference  500 shares X 55% of face value  225,000
--  150 shares X 55% of face value  --  67,500
657,500
138,750
Total  913,625
322,995
18. Mr. Nammacher also determined the amount of gifts that each Subscriber made to his or her fellow shareholders on the formation of Corporation. By doing so, Mr. Nammacher has overstepped his bounds of expertise as recognized by this Court. We give this determination no weight.↩
19. Respondent's notices of deficiency do not indicate the reason for her 40 percent discount. In addition to a discount for lack of marketability, stock may be discounted to reflect the lack of control that is inherent in a minority interest. Given Mr. Trenchard's controlling position, we find that respondent's 40 percent discount reflects the former type of discount, rather than the latter.↩
20. As the Court has previously observed, the valuation of property is an inexact science, and, if not settled by the parties, must be resolved by the judiciary by way of "Solomon-like" pronouncements. Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980); Messing v. Commissioner, 48 T.C. 502, 512↩ (1967).
21. Arguably, the value that respondent determined for Mrs. Trenchard's preferred stock should also be adjusted to reflect her minority interest in Corporation. See Estate of Chenoweth v. Commissioner, 88 T.C. 1577, 1582 (1987). A minority discount reflects the fact that a minority shareholder usually cannot control the policy or operations of a corporation. Harwood v. Commissioner, 82 T.C. 239, 267 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Estate of Andrews v. Commissioner, 79 T.C. 938, 953↩ (1982). Because respondent has neither determined nor argued for a minority discount to Mrs. Trenchard's preferred stock, we do not consider the appropriateness of one.
22. As we understand the executrix' theory, assuming arguendo that Corporation did not transfer to the Subscribers enough stock and debt to equalize the value of the property that they transferred to it, each of the Subscribers did not receive the amount of stock that would have maintained their proportionate interest in Corporation, as reflected by the stock that they each did receive.↩
23. Effective for gifts that were made after the 1981 calendar year, a gift tax return is filed on an annual basis. Sec. 442(d)(2) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 322-323.↩
24. The "values" of 19 parcels of land were contained in the Subscription Agreement, and the listed values generally, varied with a low value of $ 74,725 and a high value of $ 961,538. The values listed in the Subscription Agreement for the three tracts of land that were appraised in 1976, vis-a-vis the appraisals of Professor Scott, are as follows: ↩
Parcel
Subscription Agreement
Professor Scott
5
$ 165,300
$ 347,200
9
222,000
260,000
17
210,930
311,750