T.C. Memo. 1999-76

UNITED STATES TAX COURT

ESTATE OF WILLIAM J. DESMOND, DECEASED,
DONN KEMBLE, EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26237-96.                 Filed March 10, 1999.

Donn Kemble, for petitioner.

Jeffrey A. Schlei and Michael H. Salama, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  Respondent determined a deficiency of
$1,055,053 in, and a section 6662(b)(1) penalty of $211,011 on,
the Federal estate tax of the estate of decedent William J.
Desmond.[1]

---

[1] All section references are to the Internal Revenue Code
in effect at the date of decedent's death, and all Rule
references are to the Tax Court Rules of Practice and Procedure.

After concessions,[2] the sole issue for decision is the fair market value of: (1) Decedent's interest in Deft, Inc. (Deft), and (2) real property located at 12 Rue Verte, Newport Beach, California (the Newport property) and at 45-550 Navajo Road, Indian Wells, California (the Indian Wells property).

FINDINGS OF FACT

William J. Desmond, decedent, died on June 17, 1992. At the time of his death, decedent resided in Orange County, California.

On or about September 22, 1993, an estate tax return on his behalf was filed. For purposes of valuing his gross estate, petitioner[3] elected to use the alternate valuation date, December 17, 1992. At the time the petition was filed, petitioner resided in Newport Beach, California.

At the time of his death, decedent, as trustee, held 136,000 shares of Deft stock. This represented 81.93 percent of Deft's total outstanding shares.

The Deft stock is closely held, unlisted stock. All stock in Deft was subject to a restrictive share agreement which provided that a shareholder could transfer his or her stock to a nonshareholder only after the shareholder offered the shares to the remaining shareholders.

---

[2] The parties stipulated that petitioner is not liable for the negligence penalty under sec. 6662. Additionally, on brief, respondent conceded that petitioner is entitled to deductions related to administrative expenses and for interest paid.

[3] References to "petitioner" are to the executor of decedent's estate.

Deft is an S corporation that manufactures and sells industrial coatings for military and commercial aircraft, heavy duty trucks, and construction equipment. Deft also manufactures and sells finishes and wood stains.

Deft, like other paint companies, is a hazardous waste producer. From 1974 until 1991, Deft disposed of its hazardous waste at three disposal sites. As a result of its waste disposal, Deft faced large potential environmental liabilities.

On decedent's estate tax return, petitioner reported that the fair market value of decedent's interest in Deft was $6,160,576. This included a $2,306,250 reduction for Deft's potential environmental liabilities. KPMG Peat Marwick (KPMG) computed this figure for purposes of preparing the estate tax return.

In addition to owning Deft stock, decedent also owned two pieces of real property at his death. On the estate tax return, petitioner reported that on the alternate valuation date the fair market value of the Newport property was $800,000. On or about May 6, 1994, the Newport property was sold for a net sales price of $699,933.

On the estate tax return, petitioner reported that on the alternate valuation date the fair market value of the Indian Wells property was $280,000. On or about July 29, 1994, the Indian Wells property was sold for a net sales price of $267,782.

OPINION

I.   Value of Decedent's Interest in Deft

     A.   Valuation of Closely Held, Unlisted Stock

Property is included in a decedent's gross estate at its fair market value as of the date of the decedent's death or, if the executor elects, as of the alternate valuation date.  See secs. 2031(a), 2032(a); sec. 20.2031-1(b), Estate Tax Regs. Under section 2032(a)(2), the alternate valuation date is the date 6 months after the decedent's death.

Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.  See United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Gilford v. Commissioner, 88 T.C. 38, 48 (1987); sec. 20.2031-1(b), Estate Tax Regs.  The willing buyer and the willing seller are hypothetical persons.  See, e.g., Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990).

Determining the fair market value of closely held, unlisted corporate stock is difficult because it involves property that has no public market.  The valuation of such stock is a matter of judgment rather than of mathematics.  See Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347. The best method for valuing closely held, unlisted stock is by reference to actual arm's-length sales of the stock in the normal course of business within a reasonable time before or after the

valuation date. See Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); sec. 20.2031-2(b), Estate Tax Regs.

In the absence of arm's-length sales, the Court decides the stock's fair market value by considering factors such as the company's net worth, prospective earning power, dividend-paying capacity, management, goodwill, position in the industry, the economic outlook in its industry, and the values of publicly traded stock of comparable corporations. See sec. 2031(b); Estate of Hall v. Commissioner, 92 T.C. 312, 336 (1989); Estate of Andrews v. Commissioner, supra. There is no fixed formula for applying these factors. The weight accorded each factor is determined by the facts and circumstances of each case. See Messing v. Commissioner, 48 T.C. 502, 512 (1967). As the trier of fact, the Court has broad discretion in weighing the various factors. See Estate of O'Connell v. Commissioner, 640 F.2d 249, 251 (9th Cir. 1981), affg. on this issue T.C. Memo. 1978-191.

When valuing unlisted stock, it is sometimes appropriate to apply a lack of marketability discount to the price in order to reflect the absence of a recognized market for closely held stock and to account for the fact that closely held stock is generally not readily transferable. See Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. 91 F.3d 124 (3d Cir. 1996); Estate of Trenchard v. Commissioner, T.C. Memo. 1995-121; Rev. Rul. 77-287, 1977-2 C.B. 319, 320-321. This discount also may reflect the expense of registering the unlisted stock for public sale. See

Mandelbaum v. Commissioner, supra; Estate of Trenchard v. Commissioner, supra.

Some of the factors examined by courts in determining the amount of an appropriate lack of marketability discount are: (1) The cost of a similar corporation's public and private stock; (2) an analysis of the subject corporation's financial statements; (3) the corporation's dividend-paying capacity, its history of paying dividends, and the amount of its prior dividends; (4) the nature of the corporation, its history, its position in the industry, and its economic outlook; (5) the corporation's management; (6) the degree of control transferred with the block of stock to be valued; (7) any restriction on the transferability of the corporation's stock; (8) the period of time for which an investor must hold the subject stock to realize a sufficient profit; (9) the corporation's redemption policy; and (10) the cost of effectuating a public offering of the stock to be valued. See Estate of Gilford v. Commissioner, supra at 60; Mandelbaum v. Commissioner, supra; Rev. Rul. 77-287, supra.

Additionally, a control premium may be appropriate when valuing a large block of stock. A control premium represents the additional value associated with the shareholder's ability to control the corporation through his dictation of its policies, procedures, or operations. See Estate of Chenoweth v. Commissioner, 88 T.C. 1577, 1581-1582 (1987); Estate of Trenchard v. Commissioner, supra; Rev. Rul. 59-60, 1959-1 C.B. 237, 242. This premium for control is distinct and separate from any

discount applied for lack of marketability.  See <u>Estate of Trenchard v. Commissioner</u>, <u>supra</u>.

B. <u>Expert Reports Regarding the Fair Market Value of the Deft Stock</u>

In deciding valuation cases, courts often look to expert opinions.  The Court is not bound by the opinion of any expert, and we may accept or reject in full or in part experts' opinions proffered by the parties.  See <u>Helvering v. National Grocery Co.</u>, 304 U.S. 282, 294-295 (1938); <u>Seagate Tech., Inc., & Consol. Subs. v. Commissioner</u>, 102 T.C. 149, 186 (1994); <u>Estate of Newhouse v. Commissioner</u>, <u>supra</u> at 217; <u>Parker v. Commissioner</u>, 86 T.C. 547, 562 (1986); <u>Chiu v. Commissioner</u>, 84 T.C. 722, 734 (1985).  Moreover, the Court is free to value property at a figure for which there is no specific testimony as long as it is within the range of figures that can be adduced from the evidence.  See <u>Silverman v. Commissioner</u>, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; <u>Estate of Davis v. Commissioner</u>, 110 T.C. 530, 537 (1998).

The parties herein rely on experts' opinions to establish the fair market value of decedent's interest in Deft and whether and in what amount any discount or premium should be applied to that interest.  Petitioner bears the burden of proof on these issues.  See Rule 142(a).

1. <u>Petitioner's Expert</u>

Petitioner relies on a report compiled by Higgins, Marcus & Lovett, Inc. (HML), to establish that the fair market value of

the decedent's interest in Deft on the alternate valuation date was $6,266,000.[4]

Initially, HML determined the value of a 100-percent interest in Deft without any discount using three methods of valuation (the unadjusted values): (1) The adjusted net worth method (the asset method), (2) the discounted cash flow method (the income method), and (3) the guideline public companies method (the market method).

Under the asset method, HML determined the unadjusted value on the alternate valuation date was $12,070,000. In making this determination, HML restated Deft's tangible assets from book value to fair market value. HML then subtracted Deft's liabilities[5] from the fair market value of Deft's tangible assets. Next, HML determined the value of Deft's intangible assets by capitalizing the excess, if any, of Deft's current sustainable earning power over the normal expected return of Deft's tangible assets. HML determined there was no excess; therefore, HML attributed no value to Deft's intangible assets. Lastly, HML added the net market value of Deft's tangible assets ($12,070,000) to the value of their intangible assets ($0) to derive the unadjusted value under this method.

---

[4] Petitioner also submitted a report prepared by Tuerk & Associates analyzing the impact of the potential environmental liabilities on the marketability of the Deft shares. We find that report unhelpful, and we do not rely on it.

[5] These liabilities did not include Deft's potential environmental liabilities.

HML determined the unadjusted value under the income method was $8,109,000. Under this method, HML determined the present value of Deft's future cash flows for the 5 years following the valuation date ($4,271,000) and the present value of a terminal value computed for the fifth year ($3,838,000) using a 19-percent discount rate. HML added these present values together to find the unadjusted value under this method.

Under the market method, HML examined eight publicly traded companies primarily engaged in the manufacture and sale of paint and coatings. These companies had similar distribution channels to Deft, earned a profit over the last fiscal year, and possessed similar business and financial characteristics to Deft. HML focused on the two companies that were most similar to Deft--Grow Group and Pratt & Lambert. HML determined the average price to earnings multiple for each of the two companies.

Although these two companies were the most similar to Deft, they were significantly larger than Deft in terms of sales, total assets, and total market capitalization. Given these differences, HML applied a 30-percent downward adjustment to the average market multiple of the two guideline public companies. HML also added a 25-percent control premium to account for the fact that HML derived the multiples from information pertaining to minority interests. HML determined that the unadjusted value under the market method was $10,410,000.

After determining the unadjusted value under each of the above methods, HML weighted each of the methods equally and found

the weighted average of the unadjusted values was $10,196,000 (the weighted average unadjusted value).

HML then applied a lack of marketability discount of 25 percent to the weighted average unadjusted value.  In arriving at this percentage, HML considered several studies of typical marketability discounts used for minority interests in privately held entities.  Based on its review of this empirical evidence, HML concluded that a reasonable range for a lack of marketability discount for closely held common stock was 25 percent to 45 percent.

HML then looked at the following factors to determine where Deft's lack of marketability discount should fall within this range:  (1) The availability of public market; (2) the company's recent financial performance; (3) the future outlook for the company and industry; (4) the company's distribution policy; (5) the restrictions on the transferability of the stock; (6) the expected holding period of the stock; (7) the cost or expectation of a public offering; (8) the number of existing shareholders; (9) the size of the interest and the control inherent in the interest; and (10) the potential environmental liabilities. Based on HML's analysis of the foregoing factors, HML concluded that Deft's lack of marketability discount should fall at the low end of the range.  HML stressed the importance of the size of the interest being valued (which favored a lower discount) but noted that there was considerable uncertainty surrounding Deft's potential environmental liabilities (which favored a higher

discount). Based on the factors in toto, HML concluded the lack of marketability discount should be 25 percent.

HML deducted the 25-percent marketability discount from the weighted average unadjusted value and concluded that the fair market value of a 100-percent interest in Deft on the alternate valuation date was $7,647,000. HML then divided the fair market value of a 100-percent interest by the number of outstanding shares (166,000) and found that Deft's fair market value per share was $46.07. HML multiplied Deft's fair market value per share by the number of shares held by decedent at his death (136,000) and concluded the fair market value of the decedent's interest in Deft on the alternate valuation date was $6,266,000.

### 2. Respondent's Expert

Respondent relies on a report compiled by Business Valuation Services, Inc. (BVS). BVS's analysis was limited to determining an appropriate lack of marketability discount for the decedent's interest in Deft. BVS did not determine the unadjusted value of Deft.

Respondent instructed BVS to assume that the unadjusted value, including consideration of the potential environmental liabilities, was $10,200,000. BVS determined that an appropriate lack of marketability discount for decedent's interest should be between 0 percent and 5 percent. As instructed by respondent, BVS did not consider Deft's potential environmental liabilities in determining the appropriate discount.

C.  Court's Analysis and Conclusions

As noted earlier, we are free to accept or reject in full or in part experts' opinions proffered by the parties.  See Helvering v. National Grocery Co., 304 U.S. at 294-295; Seagate Tech., Inc., & Consol. Subs. v. Commissioner, 102 T.C. at 186; Estate of Newhouse v. Commissioner, 94 T.C. at 217.  Each of the experts' reports is susceptible to criticism.  We however believe the fair market value reached in the HML report better represents the fair market value of decedent's interest.  Because of the limitations imposed by respondent on BVS, we reject the BVS report and adopt in part, as explained infra, the HML report.

1.  Valuation Methods Accepted by Court

The HML report determined the weighted average unadjusted value based on the three different valuation methods was $10,196,000.  HML's application of the asset method was vague and generally unhelpful.  Furthermore, we believe HML may have improperly applied that method.  We do not rely on this method to determine the value of decedent's interest.

Respondent does not object to HML's computations of the unadjusted value under the income method and the market method. We find HML's conclusions as to the unadjusted values under these two methods reasonable, and we conclude that the unadjusted value under the income method is $8,109,000 and under the market method is $10,410,000.  Furthermore, we conclude each method deserves equal weight.

2.  Lack of Marketability Discount

    a.  Availability of the Discount

A lack of marketability discount reflects the absence of a recognized market for closely held stock.  See Mandelbaum v. Commissioner, T.C. Memo. 1995-255; Estate of Trenchard v. Commissioner, T.C. Memo. 1995-121; Rev. Rul. 77-287, 1977-2 C.B. 319. Neither party disputes that the Deft stock is closely held stock which is not readily tradable.  We therefore shall apply a lack of marketability discount to the unadjusted values under both methods.

    b.  Proper Elements in the Discount

HML applied a 25-percent lack of marketability discount to the weighted average unadjusted value.  HML considered numerous factors, including Deft's potential environmental liabilities, in determining the amount of the discount.

Courts have consistently recognized that potential liabilities can affect the value of corporate stock.  See Estate of Davis v. Commissioner, 110 T.C. at 552, 553, 560; Estate of Hall v. Commissioner, 92 T.C. at 329, 341-342; Payne v. Commissioner, T.C. Memo. 1998-227; Estate of Mitchell v. Commissioner, T.C. Memo. 1997-461; Sackett v. Commissioner, T.C. Memo. 1981-661; Richards v. Commissioner, T.C. Memo. 1976-380. We believe a hypothetical buyer of decedent's interest in Deft would consider these potential liabilities when negotiating a purchase price.  We find that these potential liabilities must be taken into account in the valuing of decedent's interest.

Respondent argues that applying a discount for Deft's potential environmental liabilities is improper because these liabilities have already been included in the unadjusted value calculation under the income method and the market method. We agree with respondent as to the market method but disagree as to the income method.

Under the income method, HML discounted Deft's future cash flows to present value using a discount rate determined by the Capital Asset Pricing Model (CAPM). The discount rate represents the company's expected rate of return on equity.

The CAPM uses several variables including a variable representing the company's volatility relative to market returns (Beta). Deft's Beta was determined based upon the Betas of eight similar paint and finishing companies. Respondent contends that these paint and finishing companies had Betas considerably higher than other companies' because most paint and finishing companies have potential environmental liabilities that make the return on investment in these companies more volatile. Respondent argues that these Betas already include the potential environmental liabilities of these companies; therefore, it is improper to also consider these liabilities in determining the proper discount.

We disagree with respondent. Respondent provided no evidence at trial that the Betas of the eight comparable paint companies were higher than normal due to potential environmental liabilities faced by these companies.

We conclude that the unadjusted value under the income method did not include Deft's potential environmental liabilities, and HML's consideration of Deft's potential environmental liabilities within the lack of marketability discount was proper.  Thus, we shall apply a discount to the unadjusted value under the income method for the potential environmental liabilities.

Under the market method, HML utilized the average price to earnings multiple for two similar paint and finishing companies in determining the unadjusted value.  Respondent contends that these multiples already include the potential environmental problems faced by the similar companies; therefore, it is improper to also consider these liabilities in determining the proper discount.

Respondent's expert testified that paint and finishing companies trade at lower multiples as a result of the potential environmental liabilities associated with the industry. Petitioner did not provide any other explanation for the lower multiples.  We conclude that the multiples used by HML took into account the potential environmental liabilities of the comparable companies; therefore, we shall not apply a discount to the unadjusted value under the market method for the potential environmental liabilities.

c.  Computing the Discount

We must determine an appropriate lack of marketability discount for decedent's interest.  We base our finding on a

consideration of all of the evidence in the record, paying special attention to the presence or absence of the factors discussed in Rev. Rul. 77-287, 1977-2 C.B. 319.

The following factors favor a high lack of marketability discount:  (1) There was no public market for Deft's stock; (2) Deft's profit margins were below the industry average; (3) all stock in Deft was subject to a restrictive share agreement which provided that a shareholder could transfer his or her stock to a nonshareholder only after the shareholder offered the shares to the remaining shareholders; (4) given the size and low profitability of Deft, a public offering of the stock was unlikely in the future; (5) the size of the interest is so large that it may be hard to find potential buyers in the future who could finance such a purchase; and (6) where not already considered, Deft has large potential environmental liabilities.

Only one factor favors a low lack of marketability discount: Deft had an historical favorable distribution policy (it distributed most of the company's earnings to its shareholders through higher-than-market compensation in the past).

We conclude that a 30-percent lack of marketability discount is appropriate for the Deft stock.  Of this 30-percent discount, 10 percent is attributable to Deft's potential environmental liabilities.  We shall apply the 30-percent lack of marketability discount to the unadjusted value we determined under the income method.  We however shall apply only a 20-percent lack of marketability discount to the unadjusted value we determined

under the market method because as discussed <u>supra</u>, the environmental liabilities have already been included in the unadjusted value under that method.

### 3. <u>Control Premium</u>

A control premium may be necessary when valuing an interest which gives its holder unilateral power to direct corporate action, select management, decide the amount of distributions, rearrange the corporation's capital structure, and decide whether to liquidate, merge or sell assets. See <u>Estate of Newhouse v. Commissioner</u>, 94 T.C. at 251-252. Petitioner's expert testified that a holder of decedent's interest would have the power (under California law) to sell all of Deft's assets, dissolve the company, and do virtually anything he or she wanted to do with Deft. Decedent's 81.93-percent interest is a controlling interest. HML applied a control premium of 25 percent in its calculations under the market method only.

Whether or not a control premium is appropriate depends on the valuation method employed in reaching the unadjusted value of the stock. Where the method used values the stock as if it were a controlling interest, no control premium is necessary because the control aspect has already been accounted for within the unadjusted value. See Pratt et al., Valuing A Business: The Analysis and Appraisal of Closely Held Companies 303-306 (3d ed. 1996).

The income method assumed the continuation of Deft's present policies and did not account for a change in control.  This method therefore produced an unadjusted value based on a minority interest.  Id. at 195.  Thus, it would be proper to apply a control premium to the unadjusted value under this method.  Id.

The market method is based on comparisons with publicly traded stocks.  This method produces an unadjusted value which represents the value of a minority interest, and it generally would be proper to apply a control premium to the unadjusted value under this method.  Id. at 162.

HML determined that a 25-percent control premium was appropriate under the market method.  We find HML's determination reasonable, and we conclude that a control premium of 25 percent is appropriate.  We shall apply this premium to the unadjusted value we determined under the income method.[6]

4.  Conclusion

Utilizing the income method and the market method, we find the fair market value of decedent's interest in Deft on the alternate valuation date was:

---

[6]  HML already included the control premium in its unadjusted value determined under the market method; therefore, we shall not apply a separate control premium to the unadjusted value under that method.

|                                | Income |          |       | Market      |
|--------------------------------|--------|----------|-------|-------------|
| Unadjusted Value               |        | $8,109,000 |     | $10,410,000 |
| Less Marketability Discount:   |        |          |       |             |
| Nonenvironmental               | 20%    | (1,621,800) | 20% | (2,082,000) |
| Environmental                  | 10%    | ( 810,900) | 0%  |             |
| Add Control Premium            | 25%    | 2,027,250 | [1] 0% |          |
| Fair Market Value of 100 percent Interest | | 7,703,550 | | 8,328,000 |
| x Decedent's Interest          | 81.93% | 6,311,519 | 81.93% | 6,823,130 |
| x Weight Given                 | 50%    |          | 50%   |             |
|                                |        | 3,155,759 | +   | 3,411,565 = |
| Fair Market Value of Decedent's Interest | | | |  6,567,324 |

[1] See *supra* note 6.

## II.  Value of Real Properties

### A.  Generally

On decedent's estate tax return, petitioner reported that on the alternate valuation date the fair market values of the Newport property and the Indian Wells property were $800,000 and $280,000, respectively.  Within 20 months of the alternate valuation date, both properties were sold for amounts less than the fair market values reported on decedent's estate tax return.  Petitioner claims that the fair market values for the Newport property and the Indian Wells property should be $699,933 and $267,782, respectively, based on their actual sales prices.

Values submitted by a taxpayer on the estate tax return are admissions by the taxpayer, and lower values cannot be substituted

without cogent proof that the reported values are erroneous. See Estate of Hall v. Commissioner, 92 T.C. at 337-338.

B.   The Newport Property

At trial, Mark Cardelucci, a real estate broker, testified about the real estate market conditions in Newport from the time the Newport property was valued for decedent's estate tax return until the property was later sold (the interim period).  Mr. Cardelucci testified that, with regard to the Newport property, he believed no material change in circumstances occurred during the interim period.  Furthermore, Mr. Cardelucci testified that he believed that the Newport property had been overvalued on the estate tax return.

Respondent did not produce any evidence contradicting Mr. Cardelucci's conclusions.  We conclude the fair market value of the Newport property on the alternate valuation date was $699,933.

C.   The Indian Wells Property

Conversely, petitioner failed to produce any evidence that on the alternate valuation date the fair market value of the Indian Wells property equaled its sales price 20 months later.  We conclude that petitioner has failed to provide cogent proof showing that the amount reported on decedent's estate tax return was erroneous.  We conclude the fair market value of the Indian Wells property as of the alternate valuation date was $280,000.

In reaching all of our holdings herein, we have considered all arguments made by the parties, and, to the extent not mentioned above, we find them to be irrelevant or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.